THE MAYOR AND CITY COUNCIL OF BALTIMORE
*v.* STATE, USE OF ALICE BLUEFORD ET AL.

[No. 54, October Term, 1937.]

*Decided December 10th, 1937.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*J. Francis Ireton, Assistant City Solicitor,* with whom were *R. E. Lee Marshall, City Solicitor,* and *Hector J. Ciotti, Assistant City Solicitor,* on the brief, for the appellant.

*Helen Elizabeth Brown,* with whom was *R. Palmer Ingram* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

Marie Blueford, aged eleven, daughter of William and Alice Blueford, left her home at 39 East York Street at about 1:30 o'clock p. m., on June 26th, 1933, to go to a swimming pool in Riverside Park, in Baltimore. Nothing more was heard of her until her body was found a few hours later at the bottom of the pool. The park is one of the public parks of Baltimore City, and the pool a public swimming pool maintained and managed

by the city. At the time of the accident a fee of five cents was charged for the use of the pool, a bathing suit, a locker and towels. The pool is elliptical in shape, and slopes uniformly from zero at its edge to about eight and a half feet in the center. It is 280 feet long and 180 feet wide, and is enclosed by a nine-foot wire fence. It is divided into an inner and outer zone, separated by a wire fence extending four and a half feet from the bottom of the pool. The inner zone is about 120 or 125 feet long and 90 feet wide, and is for the use only of swimmers, the outer or shallow zone is for the use of small children and persons who cannot swim. Entrance to the inner pool is through a gate at either end. Two guards are required to be on duty, when the pool is in use, to protect the bathers. One is stationed on a raft, the other rows a boat about the pool. Their duty is to maintain order, to protect the bathers from danger, and to see that none but persons able to swim are permitted within the inner or deep water zone. On the fence separating the zones signs, warning the bathers of the dangers of the inner zone and bearing the legend, "Deep water, for swimmers only," appeared at the time of the accident. The body was found in the inner zone near the fence, about midway between the two gates, where the water would have been over four feet deep. About 800 persons used the pool on the day of the accident, and at the time the body was found from twenty-five to forty persons were using it, of whom about fifteen were in the inner zone.

The guards were on duty on the day of the accident, but neither of them saw Marie Blueford, nor did any other witness in the case see her there or know when or under what circumstances she disappeared.

Several months after the death of Marie Blueford, her parents brought this action in the Baltimore City Court against the Mayor and City Council of Baltimore to recover damages for the loss which they sustained as a result of her death, on the theory that the city's employees were negligent in permitting Marie to enter the

inner zone, and also in allowing her to drown when they knew, or should have known, that she was in danger. A demurrer to an amended declaration which presented that theory was overruled, and the case was tried before the court and a jury. The trial resulted in a verdict for the plaintiffs, and upon that verdict the judgment from which this appeal was taken was entered.

There are five exceptions in the record, of which four relate to rulings on evidence, the other, the fifth, to the rulings on the prayers. Of the exceptions to the evidence the only one argued in this court was the second, noted to the action of the court in admitting in evidence a transcript of a death certificate issued by the health department of Baltimore City, in which appeared the statement that an autopsy had disclosed that the cause of death was drowning. The transcript was not authenticated, it was hearsay and irrelevant, and should have been excluded. *Standard Gas Equipment Co. v. Baldwin,* 152 Md. 321, 325, 136 A. 644. Code, art. 43, sec. 27, and Code (Supp. 1935) art. 35, sec. 54A, cited in support of the ruling, are not in point. Article 43, section 27, relates to certificates issued by the state registrar (*State, use of Schiller v. Hecht Co.,* 165 Md. 415, 424, 169 A. 311) as to the fact, not the cause, of death, and article 35, section 54A, relates to copies of business records. Assuming that, under Code Pub. Loc. Laws, art. 4, sec. 31, a certificate, properly authenticated, of the fact of death would have been admissible, the finding of the coroner as to the cause of death was not. *Standard Gas Equipment Co. v. Baldwin, supra.* But, in view of the conclusions announced *infra,* the error is not reversible.

The plaintiffs offered two prayers which were granted, the defendant sixteen, of which eight were granted and eight refused. Although it excepted to the adverse rulings in respect to the plaintiff's prayers and to the refusal of its second and third prayers, no objection to those rulings was argued in this court, and they may be disregarded except in so far as the granting of the plaintiff's prayers was inconsistent with the theory pre-

sented by the defendant's demurrer prayers. The important questions in the case are raised by the refusal of the defendant's A prayer, a general demurrer to the evidence, its B prayer that there was no legally sufficient evidence of primary negligence, its D prayer that the decedent was guilty of contributory negligence as a matter of law, and its F prayer that in maintaining the pool the city was exercising a governmental function and was not subject to liability for any negligence or fault in the performance thereof.

In orderly sequence the question first to be decided is whether the municipality is subject to liability for negligence or other default in the maintenance and management of the swimming pool.

It is an elementary and firmly established principle of municipal law that the state cannot be sued in its own courts without its consent. 59 *C. J.* 300; *State v. Wingert,* 132 Md. 605, 104 A. 117; *State of Maryland v. Balto. & O. R. Co.,* 34 Md. 344, affirmed 21 Wall. 456, 22 L. Ed. 678. The reason for the immunity is that, to subject the state to the coercive control of its own agencies would not only be inconsistent with its sovereignty, but would so hamper and impede the orderly exercise of its executive and administrative powers as to prevent the proper and adequate performance of its governmental functions. So it was said in *State v. Balto. & O. R. Co., supra:* "This immunity belongs to the State by reason of her prerogative as a sovereign, and on grounds of public policy. Parties having claims or demands against her, must present them through another department of the Government—the Legislature—and cannot assert them by suit in the Courts." That immunity extends to such agencies of the state as have no separate corporate existence but are employed by it merely as hands or instruments to execute its will (*McQuillen, Mun. Corp.* sec. 2793), but not to its creatures, such as municipal corporations, except when exercising some governmental function of the state itself. *Id.; Wynkoop v. Hagerstown,* 159 Md. 194, 150 A. 447. Where, however, a municipality is

engaged in the performance of a governmental function as an agent of the state, the same principle which protects the state from liability also protects the municipality. *Id.* So that, where that principle of immunity is invoked in behalf of a municipality charged with a tort, the primary and essential inquiry is whether the tortious act was done in the course of the performance of some governmental duty or function.

The definite and precise question submitted in this case is therefore whether the management and maintenance of a public swimming pool in a public park by the municipality is a governmental function.

Whether the maintenance of a public park by a municipality is a governmental function is a question upon which the conclusions of the several jurisdictions of the nation are not in harmony. *McQuillen, Mun. Corp.* sec. 2850, notes 71 and 72; 99 *A. L. R.* 689; 42 *A. L. R.* 264; 29 *A. L. R.* 868; 43 *C. J.* 1170, 1172. But the rule supported by what is said in *Alder v. Salt Lake City* (1924) 64 Utah 568, 231 P. 1102, to be the great weight of authority is that adopted in *Baltimore v. State, use of Ahrens*, 168 Md. 619, 179 A. 169, that the maintenance of a public park is a governmental function, and that the municipality is not liable for any default or neglect of its agents or employees in the management thereof. It is undoubtedly true that it is difficult to discover any logical distinction between the governmental character of such a duty as that of maintaining the public highways, which in this state has been held to be a private corporate function (*Baltimore v. Eagers*, 167 Md. 128, 173 A. 56), and that of maintaining the public parks, which was held in *Baltimore v. State, use of Ahrens, supra,* to be a public, political, and governmental function, except as pointed out in *Baltimore County v. Wilson*, 97 Md. 207, 210, 54 A. 71, 56 A. 596, that, while there was no liability at common law upon the municipality for failing to properly maintain the public highways, it nevertheless arose by necessary implication from the powers and duties created by the statutes, imposing

upon counties and municipalities the duty and furnishing them with the means of maintaining the public highways. In *Lane v. Minn. State Agr. Soc.*, 62 Minn. 175, 64 N. W. 382, 383, after referring to the nonliability of public corporations for any neglect or default in the performance of a public governmental function, it is said: "The liability of cities and other municipal corporations created by special charters for negligence in the care of their streets is an illogical exception to this rule, but the rule itself is too well settled, by the almost unanimous agreement of all of the authorities, to be now questioned or discussed. *Snider v. St. Paul*, 51 Minn. 466. 53 N. W. 763."

And, while the great weight of authority supports the rule that, where the Legislature confers upon a municipality, such as a city, or a *quasi* municipality, such as a county, the care and control of the public highways, charges it with the duty of keeping the same in repair, and grants to it the power and the funds or the means of securing funds to adequately perform the duty, that it is responsible for any negligent or wilful failure to do so, there is respectable authority to the contrary. *McQuillen, Mun. Corp.* secs. 2901-2902. But the two principles, one that a municipal corporation is not liable in a civil action for any default or neglect in the performance of a purely governmental function, and the exception that it is liable for failure to keep the public highways under its management and control in a reasonably safe condition, are too firmly embedded in our law to be disturbed now.

Assuming, upon the authority of *Baltimore v. State, use of Ahrens, supra,* that the maintenance and management of a public park is a governmental function, the next inquiry is whether the maintenance and management of a public swimming pool in such a park is also a governmental function. In connection with that question the fact that the city charged a small fee for entrance to the pool has been held to be relevant, in determining whether it acted in a public or private capacity.

The same reasoning which led to the conclusion announced in *Baltimore v. State, use of Ahrens, supra,* that the maintenance and operation of the public parks of Baltimore City was a public, governmental, and political function, necessarily leads to the conclusion that the maintenance of such a public convenience as a swimming pool is also a governmental function. As stated by Judge Mitchell, speaking with force and clarity for this court in *Baltimore v. State, use of Ahrens, supra,* public parks are vitally necessary to the public health and welfare, in the congested centers of population, in affording a temporary escape from the noise and dust and jostling of crowded city streets. So, too, swimming or wading pools and other public facilities for bathing have a direct and necessary relation to the public health in affording to the masses who are unable to go to the seashore or to inland lakes, or ponds or streams beyond the city, some opportunity of lessening the dangers and discomforts which are inseparable from the depressing and exhausting heat of the summer season. Such pools are maintained solely for the public comfort and convenience, the municipality derives no profit from them, they do afford the public relief from conditions which might otherwise be intolerable and dangerous, which many of them could secure in no other way.

Accordingly it has been held under varying circumstances that the maintenance of a public beach, or swimming pool, is a public governmental function, *McQuillen, Mun. Corp.* sec. 2859, although there is authority to the contrary, *Id.,* 99 *A. L. R.* 694; 43 *C. J.* 1173; 51 *A. L. R.* 370; *Crone v. El Cajon,* 133 Cal. App. 624, 24 Pac. (2nd) 846; *Seldon v. Cuyahoga* (1937) 132 Ohio St. 223, 6 N. E. (2nd) 976. The conflict in authority on the question cannot be reconciled, because it arises from basic differences in the public policy of the jurisdictions in which the question has arisen. In New York it is held that the establishment of parks and playgrounds, although they promote the public pleasure and convenience, and may "incidentally benefit the public health,"

is not a governmental function. *Augustine v. Town of Brant,* 249 N. Y. 198, 163 N. E. 732, 734; *Edinger v. Buffalo,* 213 N. Y. 674, 107 N. E. 1076. The only test suggested there is that a duty or function, which is for the peculiar advantage of the municipality and its inhabitants, is *quasi* private in its nature, but a hospital or a fire department is certainly for the peculiar advantage of the municipality and its inhabitants, although it has not been supposed that, in protecting the public against fire and disease, the municipality acts in a private capacity. *McQuillen, Mun. Corp.* secs. 2814, 2623. A more rational test is that suggested in *Heino v. City of Grand Rapids,* 202 Mich. 363, 168 N. W. 512, 517, in an action for the accidental drowning of a small boy in a public park, where the court said:

"The constitutionally authorized function this municipality was exercising was without private gain to the corporation or to individuals, for purposes essentially public and of a beneficial character in furtherance of the common welfare in harmony with the general policy of the state, and was in its nature a governmental activity, whether it be put upon the ground of health, education, charity, social betterment by furnishing the people at large free advantages for wholesome recreation and entertainment, or all of them.

"As applied to public parks of this nature, the fundamental proposition of the Massachusetts rule, which this court has generally approved, is well sustained by the reasoning in the following cases and those they lead to: *Tindley v. Salem, supra* (137 Mass. 171) *Donohue v. Newburyport,* 211 Mass. 561, 98 N. E. 1081; *Bolster v. Lawrence, supra* (225 Mass. 387, 114 N. E. 722) ; *Blair v. Granger,* 24 R. I. 17, 51 A. 1042; *Bisbing v. Asbury Park, supra* (80 N. J. L. 416, 78 A. 196) ; *Board of Park Commrs. v. Prinz,* 127 Ky. 460, 105 S. W. 948; *Nashville v. Burns,* 131 Tenn. 281, 174, S. W. 1111; *Harper v. Topeka,* 92 Kan. 11, 139 P. 1018; *Russell v. Tacoma,* 8 Wash. 156, 35 P. 605."

But in truth there is no universally accepted or all

inclusive test to determine whether a given act of a municipality is private or governmental in its nature, but the question is usually determined by the public policy recognized in the jurisdiction where it arises. As stated above, the question is not altogether one of first impression in this state, but in principle has been decided in *Baltimore v. State, use of Ahrens, supra*, but, if it were a sound public policy resting upon the principles of the common law, it would lead to the conclusion announced in that case. Where the act in question is sanctioned by legislative authority, is solely for the public benefit, with no profit or emolument inuring to the municipality, and tends to benefit the public health and promote the welfare of the whole public, and has in it no element of private interest, it is governmental in its nature. And it is better that the adequate performance of such an act be secured by public prosecution and punishment of officials, who violate the duties imposed upon them in respect to it, than to disburse public funds, dedicated to the maintenance of such public conveniences as public parks, playgrounds, hospitals, swimming pools, and beaches, maintained at the public expense, to private persons who have suffered loss through the negligence or default of municipal employees or agents charged with their management.

That conclusion is not affected by the fact that the duty of maintaining public parks in Baltimore City is permissive (Baltimore City Charter, sec. 6, subsec. 16) and not mandatory upon the municipalty, (*Heino v. City of Grand Rapids, supra*) nor by the fact that there is no specific authority for the maintenance of swimming pools, for they may naturally be included in the authority to maintain the parks in which they are located and of which they are a part.

Nor is it affected by the fact that a nominal fee was exacted for the privilege of using the pool, for in the eleven years of its existence the fees collected have never been sufficient to pay the expenses of maintaining the pool, and the deficit has been met from the general funds

of the city.  99 *A. L. R.* 694, 29 *A. L. R.* 874, 42 *A. L. R.* 265.

It follows that the appellant's A and F prayers should have been granted, and, because of their refusal, the judgment appealed from must be reversed.  In view of that conclusion, the rulings in respect to the other prayers may not be considered.

*Judgment reversed, with costs to the appellant, without a new trial.*

BOND, C. J., filed a concurring opinion as follows.

I should prefer to have it noted that there would be ground for the reversal not only in the immunity of the defendant municipality, but also in a lack of evidence to show any negligence on the part of its guards or other employees contributing to the accident.  Two guards were on duty, the usual number, but somehow nobody saw the child go under water and fail to come up.  She may have dived under as other children were doing.  The fact that none of the children nearby missed her suggests the absence of any occurrence in their sight out of the common.  The accident appears to be unexplainable.

PARKE, J., likewise concurred in the reversal on the ground that no negligence was shown on the part of the municipality or its agents.