THEODORE JOHN HERILLA *v.* MAYOR AND CITY
COUNCIL OF BALTIMORE ET AL.

[No. 1, September Term, 1977.]

*Decided October 14, 1977.*

The cause was argued before GILBERT, C. J. and MOYLAN
and MASON, JJ.

*M. R. Rohrback,* with whom was *Edward A. Derenberger*
on the brief, for appellant.

*C. Laurence Jenkins, Jr., Assistant City Solicitor for Baltimore City*, with whom were *Benjamin L. Brown, City Solicitor*, and *Richard M. Hartman, Chief City Solicitor*, on the brief, for appellees.

GILBERT, C. J., delivered the opinion of the Court.

If this opinion were being penned by Sir Arthur Conan Doyle (1859-1930), it probably would be titled, "The Case of the Wrong House."

Were it not for the tragedy that has befallen the appellant, Theodore John Herilla, and his family, the facts from which the matter *sub judice* arose might be considered humorous, something one would find in a television situation comedy. To the Herillas, however, the extensive damage inflicted upon their property, which rendered it unfit, without extensive repairs, for human habitation, is no laughing matter.

Initially, this appeal asked whether the Mayor and City Council of Baltimore (City), through its agents, acting on the erroneous belief that it had acquired a certain property, may enter upon that property, remove chattels and fixtures therefrom, damage the interior of the property, yet escape liability by invoking the legal concept of governmental immunity.

The Superior Court of Baltimore City answered the question in the affirmative when it dismissed, on preliminary objection, the suit of Herilla against the City.

Subsequent to oral argument in this Court on the question of the City's refuge behind the barrier of governmental immunity, we were advised in a letter from counsel for the City that it had discovered that its reliance upon the defense of governmental immunity was possibly misconceived. The City now states that although it originally believed the damage to the Herilla property was occasioned during the carrying out of an urban renewal project, it now knows that no such project was involved. The City was simply widening a street. Why it took the City over two (2) years to ascertain that the happenings in the instant case did not arise from

the scope of an urban renewal or other governmental function is not explained.

The City says:

"These new facts, we believe, place an entirely different aspect upon the City's Motion to Dismiss, upon which . . . [the hearing judge] originally ruled, and, in addition, may well affect the legal outcome of the case.

Although the City's position may still well be that there is immunity in this instance, we believe that these additional facts should have been brought to the attention of . . . [the hearing judge], for his determination.

Therefore, we respectfully request that . . . [the Court of Special Appeals] remand this matter to the lower court, based upon these new facts, for additional pleadings on the subject of immunity, and for a new determination by the lower court."

We shall remand the case, but not for the reasons advanced by the City, as we have an entirely different view on the question of the applicability of the doctrine of governmental immunity.

Before addressing the legal issues involved in this matter, we shall briefly recount the uncommon factual situation from which this litigation arose.

The City acquired a five (5) foot wide strip of Herilla's land in order to widen Hollins Ferry Road.[1] Sometime between May 29, 1975 and June 28, 1975, a crew of City employees, believing the City had obtained the entire property of Herilla, entered his house and removed several doors, a stained glass window, and a chandelier as well as several storm windows. Herilla alleged that the walls, ceilings, windows and floor were "negligently destroyed" by the City employees, apparently in removing the fixtures. In

---

1. The matter was represented to the trial court as an acquisition in furtherance of the Mt. Winans Urban Renewal Project, thereby, leading the trial judge to the erroneous conclusion that a governmental activity was involved.

addition, Herilla claimed that "a radiator, sliding wooden doors, electrical wiring, and a gas stove were damaged."

When the City crew went upon the Herilla property, it was, by a set of fortuitous events, unoccupied. That happenstance occurred because Herilla rented the property to another while Herilla was "overseas." Upon learning of his transfer "back to the [S]tates," he notified the tenant to vacate the property in order that Herilla and his family could move in when they reached Maryland. The hiatus in occupancy occasioned by the tenant's vacating and prior to Herilla's return is when the damage to the property took place.

Herilla's discovery of the damaged property undoubtedly produced surprise coupled with a complete change of plan. Believing the damages to be the result of vandalism, he reported the incident to the Baltimore City Police and moved his family into the home of his in-laws. Thereafter, he purchased another home, thus, obligating himself to make mortgage payments thereon. At the same time, he was required to continue mortgage payments on the damaged property.

Aggrieved by the damage to his property and the expense to which he was put in acquiring a new home, Herilla sought redress. He sued the City in a multi-count declaration for "negligence," "trespass," "negligent trespass," [2] "nuisance," and "conversion." Placing an obviously inflated value upon the property, Herilla asked $807,500 compensatory and $1,500,000 punitive damages. The declaration was met by a preliminary objection raising the defense of governmental immunity. Md. Rule 323 a 9.

At oral argument, we were told that all the fixtures have been returned to Herilla except the stained glass window.

### GOVERNMENTAL IMMUNITY

The law is well established in Maryland, as in virtually all other common law jurisdictions, that there can be no

---

**2.** Herilla's counsel concedes that such an action has not been heretofore recognized in this State.

recovery against a municipal corporation for injuries occasioned by its negligence in the exercise of functions which are essentially governmental functions. *E. Eyring & Sons Co. v. Mayor and City Council of Baltimore*, 253 Md. 380, 382, 252 A. 2d 824, 825 (1969); *Irvine v. Montgomery County*, 239 Md. 113, 117, 210 A. 2d 359, 361 (1965); *Fowler v. Bd. of County Comm'rs*, 230 Md. 504, 507, 187 A. 2d 856, 858 (1963); *cert. denied*, 375 U.S. 845, 84 S. Ct. 98, 11 L.Ed.2d 72 (1963); *rehearing denied*, 375 U. S. 936, 84 S. Ct. 334, 11 L.Ed.2d 268 (1963); *Thomas v. Prince George's County*, 200 Md. 554, 557-60, 92 A. 2d 452, 453-54 (1952); *Cox v. Anne Arundel County*, 181 Md. 428, 433, 31 A. 2d 179, 182 (1943); *Mayor and City Council of Baltimore v. Blueford*, 173 Md. 267, 271-72, 195 A. 571, 574 (1937).

The reason that governments are immune from suit by individual citizens was set out by the late Justice Oliver Wendell Holmes in *Kawananakoa v. Polyblank*, 205 U. S. 349, 353, 27 S. Ct. 526, 527, 51 L. Ed. 834, 836 (1907). Mr. Justice Holmes penned:

> "Some doubts have been expressed as to the source of the immunity of a sovereign power from suit without its own permission, but the answer has been public property since before the days of Hobbes. (Leviathan, c. 26, 2.) A sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends."

While, as Mr. Justice Holmes noted in *Polyblank*, there is some doubt as to the source of sovereign immunity, that doctrine does appear in D. Pickering, 1 *The Statutes at Large from Magna Carta to The 14th Year of K. Edward III, inclusive* (1962). Mr. Pickering has translated 3 Edward I, ch. L. (1275) as follows:

> *"And forasmuch as the King hath ordained these things unto the honour of God and holy church, and for the commonwealth, and for the remedy of such*

*as be grieved,* he would not that at any other time it should turn in prejudice of himself, or of his crown; but that such right, as appertains to him, should be saved in all points."

The Parliamentary Act of 1275 was transported to the Province of Maryland by the "Ark" and the "Dove" in the form of numbered paragraph X of the Charter presented by King Charles I to Caecilius Calvert, Baron of Baltimore. Subsequently, when Maryland declared its independence from the British Crown, it preserved to its people the common law of England "and to the benefit of such of the English statutes as existed on the Fourth day of July, seventeen hundred and seventy-six. . . ." Constitution of Maryland, Declaration of Rights, art. 5.

The dogma that a municipality, in performing an essentially governmental function, can do no wrong for which it is answerable by way of damages continues with us today as a viable part of our case law in a myriad of decisions by the Court of Appeals. Notwithstanding the multitude of such court opinions, Herilla opines that the governmental immunity doctrine is a judicial creation and should be judicially destroyed and laid to rest. In short, Herilla urges us to bite the bullet and wipe from the judicial slate a doctrine that is at least 702 years old. We decline to do so. If the cloak of governmental immunity is to be removed from the shoulders of the State and its sub-divisions, that action should be taken by the legislature, not the Courts. *Board of Trustees of Howard Community College v. Ruff, Inc.,* 278 Md. 580, 366 A. 2d 360 (1976). There is, of course, sound reason why the legislature is the proper division of government to determine whether to abolish sovereign immunity. It is that body that will be called upon, through the imposition of taxes, to pay any judgment rendered against the sovereign.

### PROPRIETARY OR CORPORATE FUNCTION

The origin of the proprietary theory does not seem to be as shrouded in historical fog as that of governmental immunity. One may glean from the *County Comm'rs of*

*Anne Arundel County v. Duckett,* 20 Md. 468, 83 Am. Dec. 557 (1864) that Maryland followed the proprietary rule laid down by Chief Judge Black in *Erie City v. Schwingle,* 22 Pa. St. 384 (1853) and Chancellor Kent in *Bartlett v. Crozier,* 17 Johns. 439, 8 Am. Dec. 428 (N.Y. 1820). The proprietary theory is, we think, an innovation of American courts. England did not subscribe to such a rule, *Russell v. Men of Devon,* 2 TR. 669, 100 Eng. Rep. 359 (1788), although the English court was careful to point out that Devon was not a corporation and had no private funds from which to pay a judgment.

Municipalities, as distinguished from the State itself, have been held liable for torts committed by them or by their officers, agents, and employees when they are exercising private or corporate powers. In those cases, an exception has been cut from the cloak of immunity. One such instance is street maintenance which is classified as a proprietary function for which the municipality is responsible if it carries out its obligation negligently or negligently fails to care for its streets. *Thomas v. Prince George's County, supra.* The logic of such a ruling eludes us, just as it has the Court of Appeals. *See Thomas v. Prince George's County,* 200 Md. at 559, 92 A. 2d at 454; *Mayor and City Council of Baltimore v. Blueford,* 173 Md. at 273, 195 A. at 574. Nevertheless, in *Blueford, supra,* Judge Offutt, writing for the Court, expressed the view the highways-street exception followed by the "great weight of authority" is "too firmly embedded in our law to be disturbed now." *Cox v. Anne Arundel County,* 181 Md. at 431, 31 A. 2d at 181. To like effect, *see Lane v. Minn. State Agricultural Soc.,* 62 Minn. 175, 177, 64 N. W. 382, 383 (1895) wherein the Court said:

> "The liability of cities and other municipal corporations created by special. charters for negligence in the care of their streets is an illogical exception . . . , but the rule itself is too well settled, by the almost unanimous agreement of all of the authorities, to be now questioned or discussed. *Snider v. City of St. Paul,* 51 Minn. 466, 53 N. W. 763 [1892]."

The better course of action might well be to wipe away the illogical distinction between proprietary functions and governmental ones. Why the maintenance of city streets is a proprietary function while the movement of traffic upon those self-same streets is a governmental function, seems to defy reason.

In any event, the law is clear that when performing its proprietary function, a municipality is required to exercise ordinary care. "It is no part of its duty, as a municipal corporation, to engage in a purely business or commercial enterprise. When it seeks and obtains from the Legislature permission to engage in such an enterprise . . .", *Henry v. City of Lincoln*, 93 Neb. 331, 334, 140 N. W. 664, 665 (1913), it is acting in a purely private business capacity, outside its functions and duties as a municipal corporation, "and is bound by all the rules of law and procedure applicable to any other private corporation or person engaged in a like enterprise." *Id.* at 334, 140 N. W. at 666.

Notwithstanding the private, as opposed to governmental nature of an enterprise, a municipality's immunity is in force where the specific act out of which the injuries arose is governmental in nature. *City of Macon v. Powell*, 133 Ga. App. 907, 213 S.E.2d 63 (1975).

The distinction between "governmental" and "proprietary" functions, as applied to the legitimate activities of governments, serves as a basis for determining whether the immunity doctrine protects a municipality from liability for a tort committed by one of its servants. *Fed. Land Bank v. Bd. of County Comm'rs*, 368 U. S. 146, 82 S. Ct. 282, 7 L.Ed.2d 199 (1961). Unfortunately, the intermingling of the two functions has led to abstruseness in drawing the boundary line which separates the two. *E. Eyring & Sons Co. v. Mayor and City Council of Baltimore, supra; Mayor and City Council of Baltimore v. Blueford, supra. See also* E. McQuillan, 18 *Municipal Corporations* § 53.29 (11th ed. 1969). "The rules sought to be established [in determining whether a given function is governmental or proprietary] are as logical as those governing French irregular verbs." *E. Eyring & Sons Co. v. Mayor and City Council of Baltimore,*

253 Md. at 382, 252 A. 2d at 825, quoting Seasongood, *Municipal Corporations: Objections to the Governmental or Proprietary Test*, 22 Va. L. Rev. 910 (1936).

There is, as *Blueford* makes clear, no universally accepted test for determining when an act is governmental or private in nature. 173 Md. at 275-76, 195 A. at 576. The question is resolved by the public policy prevailing in the particular jurisdiction where it arises. *Id.*

Paraphrasing *Blueford*, 173 Md. at 276, 195 A. at 576, we glean the test that is to be applied in this case to be:

> Is the act for the common advantage of all, without special corporate gain or monetary profit, devoid of any ingredient of private interest, and does it improve the public health and welfare?

If the answer to the test question is in the affirmative, the act is governmental in nature, and immunity applies. Conversely, if the answer is in the negative, it is a proprietary function and immunity may not be successfully pleaded. *See* E. McQuillan, 18 *Municipal Corporations* § 53.29 (11th ed. 1969); *E. Eyring & Sons Co. v. Mayor and City Council of Baltimore*, 253 Md. at 383, 252 A. 2d at 825.

Applying the test to the case now before us results in our determining that the trial court was correct in its judgment that "in the process of implementing an urban renewal ordinance the City was pursuing a public purpose accomplishment of something for the public good . . ." and *ergo*, was fulfilling a governmental function. If this were all there is to be considered, we would stop here and affirm, but there is another compelling and, perhaps, overriding issue to be decided.

### OTHER EXCEPTIONS TO MUNICIPAL IMMUNITY

What the trial judge apparently lost sight of in the case at bar is that the doctrine of municipal immunity is not absolute. It is subject to certain exceptions and limitations. The doctrine of immunity is malapropos where "the injury complained of is the taking or damaging of private property for public use without compensation," E. McQuillan, 18

*Municipal Corporations* § 53.24b (11th ed. 1969); 57 *Am. Jur., Municipal, School and State, Tort Liability* § 53, and in cases dealing with damage to property but without the actual taking thereof. *Id.*

The Fourteenth Amendment to the Constitution of the United States mandates a State shall not "deprive any person of life, liberty, or property, without due process of law ...." [3] U.S. Const. Amend. XIV, § 1. The federal constitution proscribes that invasion of the private rights of property. Neither the State itself nor any of its agencies or political sub-divisions, including municipal corporations, are allowed to establish or maintain a nuisance which causes appreciable damage to private property without being answerable for it.[4] E. McQuillan, 18 *Municipal Corporations* § 53.24b (11th ed. 1969):

> "To the extent of the damage done to such property, it is regarded and dealt with as a taking or appropriation of the property, and it is well understood that such an interference with the rights of ownership may not be made or authorized

---

3. The Maryland Constitution, Declaration of Rights, Article 19, contains similar language. It declares,

"That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the land."

4. Some reasons for the law's zealous protection of private property were well expressed by Pope Pius XII (Eugenio Pacelli) (1876-1958) in a radio broadcast made on September 1, 1944. The Pope stated:

"Private property is a natural fruit of labor, a product of intense activity of man, acquired through his energetic determination to ensure and develop with his own strength his own existence and that of his family, and to create for himself and his own an existence of just freedom, not only economic, but also political, cultural and religious.

\* \* \*

If a worker is deprived of hope to acquire some personal property, what other natural stimulus can be offered him that will inspire him to hard work, labor, saving and sobriety today, when so many nations and men have lost everything and all they have left is their capacity for work?"

except on compensation first made pursuant to the law of the land."

*Accord, Baltimore v. Sackett,* 135 Md. 56, 107 A. 557 (1919); *Taylor v. Mayor and City Council of Baltimore,* 130 Md. 133, 99 A. 900 (1917); *Baltimore City v. Fairfield Improvement Co.,* 87 Md. 352, 39 A. 1081 (1898).

A "nuisance" is defined as anything that works or causes injury, damage, hurt, inconvenience, annoyance, or discomfort to one in the legitimate enjoyment of his reasonable rights of property, or which renders ordinary use and occupation by a person of his property uncomfortable to him. *See Sherwood Bros., Inc. v. Eckard,* 204 Md. 485, 105 A. 2d 207 (1954); *Hart v. Wagner,* 184 Md. 40, 40 A. 2d 47 (1944). *Accord, District of Columbia v. Totten,* 5 F. 2d 374 (D.C. App. 1925), *cert. denied,* 269 U. S. 562, 46 S. Ct. 21, 70 L. Ed. 412 (1925); *Reese v. Wells,* 73 A. 2d 899 (D.C. Mun. App. 1950).

A municipal corporation is liable for damage to real estate as a result of a nuisance created or maintained by the municipality, even in the exercise of governmental functions. If a municipality, in attempting to perform a governmental function, as in the case *sub judice,* commits a nuisance by which an adjacent landowner is injured in the enjoyment of his owership, he may assert an action for damages. *Baltimore City v. Fairfield Improvement Co., supra; District of Columbia v. Totten, supra.*

The Court of Appeals stated, in *Taylor v. Mayor and City Council of Baltimore,* 130 Md. at 148, 99 A. at 906:

> "In this State it is well settled that when a municipal corporation has the power to abate a nuisance it is liable to persons injured in consequence of its failure to exercise such power, ... and it would be strange if notwithstanding its liability for failure to abate a nuisance created by another it could with impunity commit one itself." (Citations omitted.)

*See Baltimore v. Sackett, supra.*

We believe it beyond question but that the trespass by the City upon Herilla's property and the disassembling of portions of the interior of his house worked a substantial deprivation of his right to the ordinary use and enjoyment of his property and thus constituted a nuisance. The fact that many of the chattels and fixtures were returned by the City to Herilla may reduce the amount of damages, but the return to the rightful owner of many of the fixtures does not atone for the interior damage nor for those fixtures which were not returned.

From what we have said relative to the taking of property and nuisance, it follows, as we indicated at the outset, that the City's motion raising preliminary objection on the ground of governmental immunity should have been denied.

### DAMAGES — COMPENSATORY OR EXEMPLARY

Generally, in the absence of statutory authority exemplary or punitive damages may not be recovered against a municipality. *Euge v. Trantina,* 422 F. 2d 1070, 1074, (8th Cir. 1970); *Smith v. District of Columbia,* 336 A. 2d 831 (D.C. App. 1975); *Fisher v. City of Miami,* 172 So. 2d 455, 457 (Fla. 1965); 57 Am. Jur. 2d, *Municipal, School and State, Tort Liability* § 318. There is no such statutory authority in Maryland, hence, Herilla's claim against the City must be confined to compensatory damages.

The rationale for the rule exempting municipal corporations from the obligation to pay exemplary or punitive damages was succintly set out by Justice Thornal for the Supreme Court of Florida in *Fisher v. City of Miami,* 172 So. 2d at 457. There it is said:

"Basically, the justification for a punitive award is to punish the offender and to deter others from committing similar wrongs. Smith v. Bagwell, 19 Fla. 117, 121, [45 Am. Rep. 12, 14 (1882)]; Winn & Lovett Grocery Co. et al v. Archer, 126 Fla. 308, 171 So. 214 [(1936)]. Punishment and deterence being the principal supports for allowing this type of money award, the courts have historically

declined to allow it in actions against municipal corporations for torts committed by their employees. While the wrongdoing employee is vulnerable to a punitive award, Hutchinson v. Lott, Fla. App., 110 So. 2d [421,] 442, [(1959)] the municipality is not.

. . .

The public policy which motivates the conclusion appears to be sound. Since punishment is the objective, the people who would bear the burden of the award — the citizens — are the self-same group who are expected to benefit from the public example which the punishment makes of the wrongdoer.

Another aspect of the matter is the rule which permits evidence of the wealth of a tortfeasor as a measure of the amount of punitive damages which should be awarded. Maiborne v. Kuntz, Fla., 56 So. 2d 720 [(1952)]; Hutchinson v. Lott, supra. The theory is — the wealthier the wrongdoer, the greater the award. Otherwise stated, a relatively small sum might be adequate to punish a poor man. A much greater sum, for the same wrong, would be needed to punish a rich man. If this were allowed against municipalities, it would permit evidence of the unlimited taxing power as the measure of a proper verdict. This is often suggested as an adequate justification for denying an award of punitive damages against a city.

. . .

The deterence element likewise adds little justification for this type of award against a municipality. In the first place it is to be assumed that the municipal officials will do their duty and if discipline of a wrongdoing employee is indicated, appropriate measures will be taken without a punitive award.

Further, a huge award against the City would not necessarily deter other employees who generally

would be unlikely to be able to pay a judgment assessed against them personally."

We adopt the reasoning of the Florida Court in *Fisher*.

We return to Sir Arthur Conan Doyle, from where we started. One can visualize the legendary Dr. Watson turning to Sherlock Holmes and opining, "Holmes, the City cannot do that to Herilla." Whereupon, Holmes, between puffs on his Wellington, would respond, "My dear Watson, they have done it. What you mean, precisely, is that they cannot get away with it."

> *Order granting preliminary motion to dismiss reversed.*
> *Case remanded for further proceedings.*
> *Costs to be paid by Mayor and City Council of Baltimore.*