## MARYLAND PORT ADMINISTRATION *v.* I.T.O. CORPORATION OF BALTIMORE

[No. 176, September Term, 1978.]

*Decided December 6, 1978.*

The cause was argued before GILBERT, C. J., and MELVIN and COUCH, JJ.

*Robert B. Harrison, III, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General, William M. Huddles, Assistant Attorney General,* and *Robert R. Winter, Assistant Attorney General,* on the brief, for appellant.

*Amicus curiae* brief filed by Allied Chemical Corporation, *K. Donald Proctor* on the brief.

*Robert H. Williams, Jr.,* and *Paul B. Lang,* with whom were *Niles, Barton & Wilmer* on the brief, for appellee.

GILBERT, C. J., delivered the opinion of the Court.

This case involves the Second Battle for the Port of Baltimore.[1] It is not, however, being waged between a British fleet and soldiers under the command of Major General Samuel Smith,[2] but rather between the Maryland Port Administration (MPA)[3] and a stevedoring and terminal operating company, I.T.O. Corporation of Baltimore (ITO).[4] The battle is not being fought by cannon and shot but by counsel and contract. The objective of the parties is, nevertheless, somewhat the same as that of September 1814, but the motivation is vastly different. Admiral Cochrane, after the successful sacking of Washington, D.C., expressed his desire to lay Baltimore "under a severe contribution." [5]

---

1. The actual battle occurred September 12-13, 1814, and is usually called the Battle of Fort McHenry, although it was a battle to capture Baltimore, "the most democratic town and . . . the richest in the Union." Attributed to Admiral Sir Alexander Cochrane by Walter Lord in *The Dawn's Early Light,* (1972) ch. 8. Fort McHenry was under the direct command of Major George Armistead. *Id.* ch. 11.

2. Commander of the 3rd Division of Maryland Militia, "the main body of troops in the area." *Id.* ch. 9.

3. When it was first created by Laws 1956, Special Session, ch. 2, § 1, the MPA was known as the Maryland Port *Authority.* Its name was changed to Maryland Port *Administration* by Laws 1970, ch. 526, § 1, at which time it became a part of the Department of Transportation, Md. Transp. Code Ann. § 6-201.

4. When the parties commenced doing business together, ITO was known as Jarka Corporation. It later changed its corporate name.

5. Inasmuch as "prize money" was divided among the command, apparently in proportion to rank, it was considerably more profitable to accept "contribution," than to destroy. According to Mr. Lord, the City of Alexandria "contributed" to the British to avoid a fate similar to that of the Nation's capitol.

ITO is determined to require MPA to pay to ITO the sum of $213,601.17, but instead of being met by 15,000 defenders armed with various weapons, they were confronted with the invisible and, when applicable, invincible shield of sovereign immunity. The Superior Court of Baltimore City brushed aside MPA's defense, and a jury of that court rendered a verdict against MPA in the amount of $213,601.17. It would appear that ITO succeeded where the British failed, but the "perilous fight" was not ended with the jury's verdict. The MPA has appealed.[6]

In this Court it asserts:

I. The trial court should have granted MPA's motion raising preliminary objection on the basis of sovereign immunity.

II. The trial judge should have excluded oral evidence concerning ITO's intention or understanding of a contract dated January 13, 1971.

III. The jury should have been instructed that testimony grounded on memory of oral statements made with a person since deceased "should be received with great caution and if a long time has elapsed since the alleged statements, such testimony is held to be unsatisfactory and inconclusive."

If MPA's first attack is successful, they carry the day, and we need not respond to the other two sorties. Before discussing the merits of the appeal, we shall set the stage upon which this drama was played.

MPA is clothed by statute, Md. Transportation Code Ann. § 6-204 (i) with authority to "construct, reconstruct, rehabilitate, improve, maintain, lease as lessor or as lessee,

---

6. Allied Chemical Corporation was permitted, by order of this Court, on June 23, 1978, to file an *amicus curiae* brief. The *amicus* urges us to affirm the judgment of the trial court. The *amicus* is influenced in no small measure by a $5,000,000 claim against MPA and, needless to say, would like to see the defense of sovereign immunity rejected.

repair, and operate port facilities within its territorial jurisdiction. . . ." Under full color of its powers, MPA has developed the Dundalk Marine Terminal within Baltimore Harbor. Among the terminal services provided by ITO is the partial loading and unloading of cargo from trucks. The performance of such services is referred to in the industry as "tailgate service." ITO "tailgated" for MPA [7] at the Dundalk terminal under a "tariff" filed by MPA with the Federal Maritime Commission.

On February 1, 1967, MPA and ITO entered into a written contract which spelled out a billing procedure whereby MPA then paid ITO in accordance with the agreement. In short, MPA, for a fee, acted as the billing and collection agent of ITO.

The 1967 contract provided in pertinent part:

"I.  *Truck Freight*
    A.  *Export*
        . . . .
        (5) Maryland Port Authority will be responsible for the *billing and collection in accordance with the prevailing tariff charges.*
        "(6) Maryland Port Authority will verify each day, with representative of subcontractor, the total amount of truck tonnage handled that day and service provided.

*NOTE*: All billing on verified information will be final.

        (7) Subcontractor will bill Maryland Port Authority semi-monthly covering the period of the first 15 days or the last 15 days of each month for the unloading service calculated at the total tons handled multiplied by the rate of $1.68 per ton for tailgate service or $3.68 per ton for full unloading service.

---

7. "MPA," as used in this sentence, includes both the M. P. *Authority* and the M. P. *Administration.*

*EXCEPTION*: Commodities on which a negotiated rate is permitted will be billed by the Maryland Port Authority at the rate supplied by the subcontractor including 32 cents per ton.

(8) The Maryland Port Authority will remit the amount billed by the subcontractor within 30 days." (Emphasis supplied).

With respect to "imports," the wording of the contract was identical except for the changing of "export" to "import," "received" to "delivered," and making other verb modifications indicative of the distinction between shipping and receiving.

The tariff alluded to in the quoted agreement at I. A. (5) was a terminal operator's tariff published by the Baltimore Marine Terminal Operator's Association (BMTA), and it was binding on both MPA and ITO. The tariff provided published rates for truck loading and unloading, including a per ton charge. It also provided for a minimum charge per bill of lading when the cargo was less than one ton.

A new billing procedure agreement was entered into between MPA and ITO in January 1971, effective February 5, 1971, replacing the 1967 agreement. The 1971 agreement, containing the seeds of the not-so-friendly strife leading to this litigation, was similar to the 1967 agreement except with respect to part I. A. 7. The section provided:

"I. *Truck Freight*
A. *Export*

. . . .

(7) Subcontractor will bill Maryland Port Authority semi-monthly, covering the period of the first 15 days or the last 15 days of each month, for the unloading service performed. *Reimbursement will be calculated by multiplying the total tons handled in the period by the prevailing tariff charges* and deducting therefrom $.03 per ton service charge. *EXCEPTION*: Commodities on which a negotiated rate is permitted will be billed by

> Maryland Port Authority at the rate supplied by the subcontractor subject to the calculations enumerated above." (Emphasis supplied.)

The section of the contract dealing with "imports" read in the same way except for the change from "export" to "import" where applicable.

Subsequent to the execution of the 1971 agreement, MPA withdrew from BMTA. It then published its own tariff.[8] Both the BMTA and MPA tariffs contained a *rate per ton* and a *minimum rate per bill of lading*. When ITO did its own billing prior to 1967, it collected the minimum rate as per the tariff. The former vice-president of ITO told the jury that the purpose of the minimum charges was to compensate ITO for its labor and equipment costs, and that it was as expensive to handle one hundred pounds as it was one ton.

Following the effective date of the 1967 agreement, MPA billed shippers on the basis of the per ton rate when applicable and on the basis of the minimum charge per bill of lading, when the flat ton rate was inapplicable. MPA made remittances to ITO by multiplying the total tons handled by the dollar amount set out in the 1967 agreement and, under the 1971 agreement, by the per ton rate set out in the applicable tariff.

What MPA did not do is to account to ITO for the minimum charges per bill of lading. MPA explained at the trial that the minimum charges were included in the tariff in order to compensate it for the cost of billing and collecting for relatively small shipments.[9] Added to the invoices which were sent to the shippers by MPA was a nominal terminal service charge. MPA contended that such a charge compensated it for the cost of maintaining the roads and other terminal facilities.

---

8. It was legally necessary for MPA to have some tariff in effect, whether its own or one issued by a group of which it was a member, in order that MPA could bill for terminal services provided by ITO and for its own terminal service charge. *See* Federal Maritime Commission Order 15, dated October 15, 1965, 46 CFR § 533 (1978).

9. MPA presented testimony through its Comptroller that while only 3% of all tonnage handled involved minimum charges, 75% to 80% of the invoices sent were for those charges.

Over the objection of MPA, a former vice-president of ITO was allowed to testify that he negotiated the 1967 and 1971 agreements with the then Director of Transportation,[10] and that while nothing was ever said about the minimum bill of lading charges, it was the intent of the parties that those charges would be remitted by MPA to ITO. MPA was limited to a $.03 per ton service charge for billing and collecting from the various shippers. The trial judge permitted that parol evidence because it served to explain the ambiguity in the 1971 agreement relative to the minimum charges.

The former ITO vice-president informed the jury that he had always assumed that MPA was remitting the minimum charges to ITO and that it was not until after he left the company and a new accounting method was installed that it was learned that MPA was not accounting to ITO for those minimum charges. ITO unsuccessfully demanded payment from MPA. This law suit *in assumpsit* followed.

## I.

The principal thrust of this appeal is MPA's assertion that its motion raising preliminary objection on the ground of sovereign immunity should have been granted.

That doctrine, sometimes alternatively styled "governmental immunity," stems from the Common Law. *Herilla v. Baltimore City,* 37 Md. App. 481, 378 A. 2d 162 (1977). The Court of Appeals, in *Brohawn & Bros., Inc. v. Board of Trustees of Chesapeake College,* 269 Md. 164, 165, 304 A. 2d 819, 820 (1973), speaking through Judge Digges, explained the doctrine thusly:

> "[A] litigant is precluded from asserting an otherwise meritorious cause of action against this sovereign State or one of its agencies which has inherited its sovereign attributes, unless expressly waived by statute or by necessary inference from such a legislative enactment."

---

**10.** Mr. Philip G. Kraemer was the Director of Transportation at the time. Mr. Kraemer died in 1973.

Numerous Maryland appellate decisions have discussed the concept of governmental immunity from its origin to the present time. *See e.g., Board v. John K. Ruff, Inc.,* 278 Md. 580, 366 A. 2d 360 (1976); *American Structures v. City of Baltimore,* 278 Md. 356, 364 A. 2d 55 (1976); *Godwin v. County Comm'rs,* 256 Md. 326, 260 A. 2d 295 (1970); *Cox v. Anne Arundel County,* 181 Md. 428, 31 A. 2d 179 (1943); *University of Maryland v. Maas,* 173 Md. 554, 197 A. 123 (1938); *State v. B. & O. R. R.,* 34 Md. 344 (1871); *Herilla v. City of Baltimore,* 37 Md. App. 481, 378 A. 2d 162 (1977); *Frosburg v. State,* 37 Md. App. 18, 375 A. 2d 582 (1977). *See also* I. F. Pollock and F. Maitland, *The History of the English Law,* 518 (3d ed. 1909); 36 Md. L. Rev. 654 (1977).[11] The rationale for the continued application of the doctrine in Maryland seems to have begun to shift from the concept of inherited sovereignty to one of public policy. That, at least, is the way it was expressed by Chief Judge Bartol in *State v. B. & O. R. R.,* 34 Md. 344, 374 (1871) when he wrote:

> "This [sovereign] immunity belongs to the State by reason of her prerogative as a sovereign, *and on grounds of public policy.* Parties having claims or demands against her, must present them through another department of the Government — the Legislature — and cannot assert them by suit in the Courts." (Emphasis supplied.)

---

**11.** The doctrine is not without its critics. *See* Clarke, *Municipal Responsibility in Tort in Maryland,* 3 Md. L. Rev. 159 (1939); Borchard, *Government Liability in Tort,* 34 Yale L. J. 1 (1924); Prosser, *Law of Torts* §§ 131 and 975-87 (4th ed.). *See also* Frosburg v. State, 37 Md. App. 18, 25, 375 A. 2d 582, 587 (1977) n. 6, wherein Judge Liss said:

"That the Legislature is aware of the problems created by the application of the doctrine is evidenced by the recent enactment of Chapter 450 of the Laws of Maryland effective July 1, 1976, which provides that in the absence of a provision to the contrary neither the State, its officers, departments, agencies, boards and commissions, nor any municipal corporation or unit of municipal government, nor any county or unit of county government may raise the defense of sovereign immunity in an action based on a certain written contract brought within one year after the claim arose or the contract was performed whichever is later."

Judge Barnes, in *Godwin,* revisited *State v. B. & O. R. R.,* *supra,* and noted that in Maryland the doctrine was bottomed, *inter alia,* on "public policy." He went on to note that:

"[W]hen one considers the financial and other problems which might arise if the doctrine of sovereign immunity were not applicable, it is probably wise that our predecessors did apply it in Maryland. . . ." *Godwin v. County Comm'rs,* 256 Md. at 333, 260 A. 2d at 298.[12]

Out of the cases has emerged the modern rule iterated in *American Structures v. City of Baltimore,* 278 Md. 356, 359, 364 A. 2d 55, 56 (1976) and reiterated in *Board v. John K. Ruff, Inc.,* 278 Md. 580, 584, 366 A. 2d 360, 362 (1976) that:

"[A]n action . . . brought for a money judgment in contract or in tort against the State or an agency of the State without the State's consent, actual or implied, . . . must be defended on the ground of sovereign immunity, which cannot be waived unless *funds have been appropriated for the purpose or the agency can provide funds by taxation. . . .*" (Citations omitted.) (Emphasis supplied.)

The word "taxation" means "1.a. The act or practice of imposing taxes. b. The fact of being taxed. 2. An assessed amount of tax." *American Heritage Dictionary of the English Language* (1970). In none of the prior cases has the noun "taxation" been used. All the previous decisions speak of the power or authority "to raise money for the purpose of paying damages." *University of Maryland v. Maas,* 173 Md. at 558-560, 197 A. at 125 (1938). *See Calvert Associates v. Department of Employment and Social Services,* 277 Md. 372, 357 A. 2d 839 (1976); *Brohawn v. Board of Trustees, supra;*

---

12. The Legislature, in its 1976 Session, abolished the defense of governmental immunity in an action based on contract, provided it is brought within one year from the time the claim arose, and, further, provided there is no specific provision proscribing action. Laws 1976, ch. 450. The lowering of the protection shield so as to permit, under the specified conditions, suits against the State for breach of contract does not help ITO in the matter *sub judice.* This is so because Laws 1976, ch. 450 mandates that it applies only to contracts entered into or executed on or after July 1, 1976.

*Jekofsky v. State Roads Comm'n,* 264 Md. 471, 287 A. 2d 40 (1972); *Stanley v. Mellor,* 168 Md. 465, 178 A. 106 (1935); *Dunne v. State,* 162 Md. 274, 159 A. 751 (1932); *Williams v. Fitzhugh,* 147 Md. 384, 128 A. 137 (1925); *Fisher & Carozza Co. v. Mackall,* 138 Md. 586, 114 A. 580 (1921); *State v. Rich,* 126 Md. 643, 95 A. 956 (1915); *Weddle v. School Comm'rs,* 94 Md. 334, 51 A. 289 (1902); *State v. B. & O. R. R., supra.* Thus, we believe the Court, in *American Structures* and *Ruff,* employed the word "taxation" in a non-technical or imprecise sense to mean the ability or power to raise funds. In any event, it is not necessary that the agency possess the power to tax. All that is required is that two specific criteria be met: first, the Legislature must have explicitly or implicitly removed the protective barrier of governmental immunity from the agency, and second, the agency either has the funds from which it can pay the claim or it possesses the power to raise those funds. *Brohawn v. Board, supra.*

Former Md. Ann. Code art. 62B, § 5, in effect at the time of the signing of the 1967 and 1971 agreements, provided that MPA was "(b) To have perpetual succession, and *to sue and be sued in its own name and plead and be impleaded."* (Emphasis supplied.) [13]

That language satisfied the first requirement of *Brohawn* and *Ruff.* There yet remains the question of whether MPA has funds available to pay a judgment against it *or* whether it possesses the power or authority to raise those funds.

When the Legislature created the MPA by Laws 1956, Extra Session, ch. 2, then codified as Md. Ann. Code art. 62B, § 13 (a), it conferred upon the Authority sweeping powers to generate and expend funds. In fact, the MPA's money raising activities were without supervision or regulation by any other agency of the State.

Article 62B, § 13 (a) provided:

> "The authority is hereby authorized to fix, revise, charge and collect rentals, rates, fees or other

---

[13]. Md. Transportation Code Ann. § 6-204 (b) now reads:

"The Administration may sue and be sued in its own name."

charges for the use of each project. . . . Such rentals and other rates, fees and charges shall be so fixed and adjusted in respect of the aggregate thereof from the projects under the control of the Authority as *to provide funds sufficient with other revenues, if any, (i) to pay the Authority's current expenses* . . . , and (iv) to provide funds for paying the cost of enlarging, extending, reconstructing or improving any project or projects. Such rentals and other rates, fees, and charges shall not be subject to supervision or regulation by any department, division, commission, board, bureau or agency of the State or any political subdivision thereof." (Emphasis supplied.)

"Current expenses" were defined in section 4 (d) of article 62B to mean:

"[T]he Authority's reasonable and necessary current expenses of maintaining, repairing and operating the projects and shall include, without limiting the generality of the foregoing . . . ordinary and usual expenses of maintenance and repair which may include expenses not annually recurring, *expenses incurred in the performance of its powers and duties under the provisions of this Article,* and any other expenses required to be paid by the Authority under the provisions of any trust agreement securing revenue bonds or by law. . . ." (Emphasis supplied.)

An inquiry by the first Chairman of the MPA [14] to the Attorney General [15] as to the extent of the Authority's fiscal responsibility, brought the following reply:

"It is apparent from the broad scope of powers given to the Port Authority . . . that the Authority was intended to operate with a substantial degree of independence in order that it might carry out its functions with the flexibility ordinarily found in business concerns. . . .

---

14. Robert W. Williams, Esq.
15. Hon. C. Ferdinand Sybert.

... Article 62B, as enacted ... is obviously intended, in spite of the above provisions generally applicable to all state agencies, *to permit the Port Authority to establish its own budget in any manner it may see fit.* . . . [I]t is apparent that the Legislature intended that the Authority not be subject to a preliminary budget, but rather that the funds specifically made available to the Authority, to which funds the Authority is limited, *be budgeted as the Authority alone should see fit. . . .*" (Emphasis supplied.) 41 Op. A. G. 301, 301-02 (1956).

Aided materially by Allied Chemical Corporation,[16] in the role of *amicus curiae,* ITO argues that the power and discretion vested in the Authority to raise funds in pursuit of its business set it "apart from virtually all other State agencies," and, therefore, "[t]hat the discharge of a judgment arising from an action on a contract validly entered into" by the parties "is within the purposes set forth above for expenditures by the Authority."

We think it beyond serious doubt that under terms of the Act creating it,[17] MPA had either the "funds sufficient with other revenues ... (i) to pay the Authority's current expenses," or the means by which it could acquire such funds. We conclude that when it originally created the Maryland Port *Authority,* the Legislature explicitly satisfied the first prong of *Brohawn-Ruff* by expressly authorizing MPA to sue and be sued. At the same time, it implicitly met the test of *Brohawn-Ruff's* second prong by permitting MPA fiscal autonomy. Consequently, at the time MPA entered into the contracts with ITO, MPA was more akin to a private business enterprise than a governmental agency. The armor of immunity, usually attendant on State agencies, had been removed by the General Assembly.

---

**16.** *See* n. 6 *supra.* The claim is for "damages ... resulting from the Port Administration's refusal to accept for disposal ... chrome ore by-product." Obviously, Allied is waiting to storm the port if the rampart of governmental immunity is razed.

**17.** Laws 1956, Extra Session, ch. 2.

The 1970 Session of the General Assembly stripped the fiscal autonomy from MPA and cloaked it with governmental immunity when it abolished MPA as the Maryland Port *Authority* and created the Maryland Port *Administration* as an agency of the Maryland State Department of Transportation. Laws 1970, ch. 526, § 1.[18]

The broad autonomous powers of the Authority were denied the Administration. "[A]ll powers, duties, and functions vested in the Maryland Port Administration" were made "subject to the authority of the Secretary of Transportation and the Maryland Transportation Authority [(MTA)]. . . ." The Secretary or MTA, however, was allowed to "dispense with . . . [the] power of approval" and to permit the MPA "to proceed . . . without obtaining prior approval to the extent that the Secretary or . . . [MTA] deem[ed] appropriate." Laws 1970, ch. 526, § 5.

We have not been cited to, nor have we found, any rule or regulation promulgated by the Secretary that is germane to the issue of the authority of MPA to retain funds to pay claims against it or to raise money to so do. It appears that the monies received by MPA, except those pledged to secure revenue bonds, have been required since July 1, 1971, to be deposited into a trust fund whose creation was mandated by Laws 1970, ch. 526, § 2.[19] That section provides:

> "[E]xcept for rentals, rates, fees, tolls or any other charges or revenues pledged to secure revenue bonds of prior issues, . . . and except for other funds by law expressly applied to some other purpose or declared exempt from the provisions of this section, there shall be transferred to the credit of such Fund for the account of the Department all funds theretofore held for the account of any of the agencies, administrations, authorities, commissions,

---

**18.** The Department of Transportation was codified in Md. Ann. Code art. 41, §§ 207-208D and elsewhere in the Code. Codified statutes dealing with the Department are now found in the Transportation Article of the Code, per Laws 1977, ch. 13, § 1, effective July 1, 1977.

**19.** Then codified as Md. Ann. Code art. 94, § 11a.

boards, instrumentalities and offices of the State government either included within the Department of Transportation or abolished under Article 41 of the Code. Thereafter, except with respect to ... other funds by law expressly applied to some other purpose or declared exempt from this section, there shall be credited to such Fund for the account of the Department any and all taxes, fees, charges and revenues of whatever kind collected or received by, paid or appropriated to, or to be credited to the account of, the Department or any of its constituent agencies or administrations, in the exercise of their rights, powers, duties, obligations or functions, including, but not by way of limitation, and general fund appropriations, the proceeds of any State loan made for transportation purposes and any federal grants for such purposes. . . ." [20]

Expenditures from the Fund are made by the Secretary of the Department or MTA. Neither is a party to this litigation. MPA further contends, pointing to Md. Ann. Code art. 94A, § 11 (d), that expenditures from the Fund are limited to its revenue bond debt service requirement, "any lawful purpose related to its rights, powers, duties and obligations," the operating expenses of the Department, and "the costs of any transportation facilities including their maintenance and repair. *Such expenditure shall be made in accordance with appropriation provided in any applicable budget bill or supplement appropriation bill. . . .*" (Emphasis supplied.) MPA reasons that inasmuch as no appropriation, adopted by the General Assembly, has been included in any budget bill or supplemental appropriation to pay ITO's claim, funds are not available to pay the judgment, and, therefore, the argument that governmental immunity has been waived falls short of meeting the second prong of the *Brohawn-Ruff* test.

That argument leads to the rhetorical question of whether the State may create an agency, bestow virtual fiscal

---

**20.** The "Transportation Trust Fund," in substantially modified form, now appears in Md. Transportation Code Ann. § 3-216.

autonomy upon it, deny it the defense of governmental immunity, permit it to enter into contracts, subsequently abolish the agency, establish a successor agency cloaked with immunity, and thereby prevent a party who dealt with the predecessor from recovering through judicial proceedings monies due.

The answer to that question was handed down by the Supreme Court of the United States years ago in *Memphis R.R. v. Tennessee,* 101 U. S. 337,[21] 25 L. Ed. 960 (1879). The majority adopted, through Mr. Chief Justice Waite, the view that when, as here, the State has allowed itself to be sued on a contract, a subsequent withdrawal of that privilege was not an impairment of contract within the meaning of the Constitution because the courts were powerless to enforce a remedy.[22] Implicit in the impairment of contract clause of the Constitution is the ability to enforce a remedy, and where the court is without power to enforce the contract there is no impairment in the constitutional sense.

At the same term of court, October 1879, the Supreme Court considered a case arising from Alabama. That State had enacted a statute which allowed itself to be sued in its own courts. During the time that the statute was in effect a contract was entered into between the State and a railroad company. Alabama law also provided "that if a judgment should be rendered against the State, it was the duty of the Comptroller . . . to issue his warrant for the amount. . . ." The railroad commenced proceedings while those statutes were in force. Before judgment was entered the laws were repealed and the trial court dismissed the action for want of jurisdiction. The State's highest court affirmed. Relying upon its earlier decision of *Memphis R.R. v. Tennessee, supra,* the Supreme Court said that it was "unable to see any substantial difference between" the Alabama and Tennessee cases. The Chief Justice noted, "In neither State has there been granted

---

21. Justices Swayne and Strong dissented.
22. "A rightful judgment against a state, on the other hand, gives a vested right which cannot be taken away, pending writ of error, by a repeal of the statute which authorized the state to be sued." 16 Am. Jur. 2d § 460, citing McCullough v. Virginia, 172 U. S. 102, 19 S. Ct. 134, 43 L. Ed. 382 (1898).

such a remedy for the enforcement of the contracts of the sovereignty as may not, under the Constitution of the United States, be taken away." *South and North Ala. R. Co. v. Alabama,* 101 U. S. 832, 835, 25 L. Ed. 973 (1879). Similar decisions of the Supreme Court are *Home Building & Loan Assoc. v. Blaisdell,* 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413 (1934); *Baltzer v. North Carolina,* 161 U. S. 240, 16 S. Ct. 500, 40 L. Ed. 684 (1896); *In re Ayers,* 123 U. S. 443, 8 S. Ct. 164, 31 L. Ed. 216 (1887); *Beers v. Arkansas,* 61 U. S. 527, 15 L. Ed. 991 (1857); *See also U.S. Trust Co. of N.Y. v. New Jersey,* 431 U. S. 1, 97 S. Ct. 1505, 52 L.Ed.2d 92 (1977); *El Paso v. Simmons,* 379 U. S. 497, 85 S. Ct. 577, 13 L.Ed.2d 446 (1965); L. Tribe, *American Constitutional Law* §§ 9-6, 9-7 (1978).

The rule that is gleaned from the Supreme Court decisions is that the State may waive immunity, enter into a contract and later rescind or repeal the waiver of immunity. Such action does not violate the Constitutional ban on impairment of contract because where there is no judicial remedy of enforcement, there is no contract within the meaning of Article 1, § 10 of the Constitution. 16 Am. Jur. 2d *Constitutional Law* §§ 459-460.

## SUMMARY

Where, as here, a State agency is statutorily divested of the right to invoke the defense of governmental immunity, and it enters into a contract, which it subsequently breaches, the Legislature may, by another statute, throw a blanket of governmental immunity over the agency so as to preclude recovery. That action by the State is not violative of the "impairment of contract" clause of the Constitution, and those who contract with the State stand in harm's way because they rely solely on the faith and credit of the State. Recompense, if any there be, for the State's breach of contract must come from the Legislature, not the courts.

We hold that MPA's motion raising preliminary objection should have been granted. It follows that the judgment must

be reversed. In view of our holding, we do not reach the other issues raised by the appellant.

*Judgment reversed.*
*Costs to be paid by appellee.*