*Candace McCarthy v. Board of Commissioners for Frederick County, Maryland*, No. 1792, Sept. Term 2023. Opinion by Tang, J.


**MUNICIPAL, COUNTY, AND LOCAL GOVERNMENT—IMMUNITY AND EXCEPTIONS THERETO IN GENERAL—GOVERNMENTAL FUNCTION IMMUNITY—GOVERNMENT BUILDINGS**

A local government possesses immunity for tortious conduct that occurs in the exercise of a governmental rather than a proprietary function. The maintenance of a courthouse is a governmental function. *Harford County Commissioners v. Love*, 173 Md. 429, 433 (1938).

Frederick County was immune from a negligence claim arising from mold exposure in the historic John Hanson House, where plaintiff was employed by the Office of the Public Defender (the "OPD"). The County had acquired the House and reconstructed it to be incorporated into the Frederick County Courthouse Complex. Because the House was part of a courthouse, the County's maintenance of the House was a governmental function. That the County leased office space in the House to the OPD and received payments to cover the OPD's proportionate share of the costs for the Complex's operation and maintenance did not render the maintenance of the House a proprietary function.


**NUISANCE—PERSONS ENTITLED TO MAINTAIN PROCEEDINGS— PERSONS ENTITLED TO SUE**

Private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land. A claimant must either have lawful possession of or have a right to occupy the land.

An employee's right to be present in the workplace does not confer upon her an interest in the property affected that would entitle her to maintain a private nuisance suit.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1792

September Term, 2023

_____

CANDACE MCCARTHY

v.

BOARD OF COMMISSIONERS FOR
FREDERICK COUNTY, MARYLAND

_____

Berger,
Tang,
Kehoe, Christopher B.
 (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Tang, J.

_____

Filed: June 27, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

The appellant, Candace McCarthy ("McCarthy"), sued the appellee, Board of Commissioners for Frederick County, Maryland (the "County"), for negligence and private nuisance.[1] McCarthy, who worked for the Office of the Public Defender (the "OPD"), claimed that she suffered respiratory injuries due to exposure to black mold while working in the John Hanson House.[2] This building is part of the Frederick County Courthouse Complex, where the OPD leased office space from the County.

After conducting discovery, the County moved to dismiss or, in the alternative, for summary judgment on both claims. The court granted summary judgment on the negligence claim because it was barred by governmental immunity. It also granted

---

[1] In 2020, McCarthy and a co-worker filed the lawsuit against the Board of Commissioners for Frederick County, Maryland. However, years earlier, in 2014, "Frederick County became a charter county, with a County Executive and a County Council, rather than a Board of County Commissioners." *75-80 Props., LLC v. Rale, Inc.*, 470 Md. 598, 612 n.3 (2020). Neither side raised an issue with the Board of Commissioners not being the proper party in the case. Accordingly, we shall not address it. *See Singer v. Steven Kokes, Inc.*, 39 Md. App. 180, 181 n.1 (1978) (declining to address issue of improper parties where parties did not raise issue below or on appeal). For convenience, we shall refer to the Board of Commissioners as the County.

The County moved to dismiss the original complaint. The circuit court granted this motion without prejudice, allowing McCarthy and her co-worker to conduct discovery regarding the issue of governmental immunity. After completing discovery, they amended their complaint to include claims of negligence and public and private nuisance. Ultimately, the court granted summary judgment on all counts. The co-worker did not file an appeal. Additionally, McCarthy chose not to appeal the court's decision to grant summary judgment on her public nuisance claim. Therefore, her claims for negligence and private nuisance are the only ones before us.

[2] From 1781 to 1782, John Hanson was the President of the United States in Congress Assembled under the Articles of Confederation.

summary judgment on the private nuisance claim on the merits. On appeal, McCarthy

presents two questions, which we have rephrased:[3]

1. Did the circuit court err in granting summary judgment as to the negligence claim on the basis that the County enjoys governmental immunity?

2. Did the circuit court err in granting summary judgment as to the private nuisance claim?

For the following reasons, we answer both questions in the negative and affirm the

judgment of the circuit court.

## BACKGROUND

The Frederick County Courthouse Complex, located at 100 West Patrick Street in

Frederick, Maryland, consists of two buildings: (1) the courthouse proper, where court

proceedings occur and where certain State and County agencies are located; and (2) the

John Hanson House, where the OPD leased office space from the County during the

relevant period.

In August 2017, McCarthy began working at the OPD. She worked in the John

Hanson House, where she claimed to smell a constant, damp, and mildewy odor from the

---

[3] In her brief, McCarthy phrased the issues as follows:

I. Did the circuit court err as a matter of law when it granted summary judgment in favor of [the County] because the question of whether maintenance functions at the John Hanson House served a proprietary purpose is a question for the jury at trial?

II. Did the circuit court err as a matter of law when it granted summary judgment in favor of [the County] by finding that a claimant must have a proprietary interest in a premises to maintain a claim for private nuisance?

2

building and its air vents that made her ill. In 2018, she complained about the problem and learned that mold was present in the building's basement. She asserted that her exposure to the mold resulted in her developing an autoimmune disease. Thereafter, McCarthy sued the County for negligence and private nuisance.

After discovery, the County filed a motion to dismiss, or in the alternative, a motion for summary judgment. The County argued that the negligence claim was barred by governmental immunity. It contended that the John Hanson House, where the mold exposure occurred, was part of the Courthouse Complex, and thus, the maintenance of the John Hanson House fell under the governmental function of maintaining a courthouse, which enjoys immunity. In addition, the County asserted that it did not derive any profit from leasing office space to the OPD in a way that would render its maintenance of the John Hanson House proprietary. Regarding the private nuisance claim, for which the County does not enjoy immunity, the County argued that the claim failed because it was undisputed that McCarthy, as an employee working in the building, had no ownership interest in the property.

McCarthy opposed the motion. She argued that the John Hanson House is not part of the Complex; it functioned as an office space where the County leased areas to State agencies, rather than serving as a courthouse. She contended that maintenance of this building was not conducted out of a governmental duty to the public. Instead, it was carried out under the terms of the memorandum of understanding and lease agreements between the County and the State for which the County received payments. She argued that this situation amounted to a proprietary function, thereby taking it outside the protection of

3

immunity. Regarding the claim of private nuisance, McCarthy maintained that, as an employee, she "lawfully occupied" the John Hanson House and therefore had a property interest in the building.

After holding a hearing, the circuit court announced its decision. First, the court granted summary judgment on McCarthy's negligence claim due to governmental immunity. The court explained:

> What I find in this case is that the John Hanson House, in essence, has been subsumed within the courthouse. I mean it is built so that it is accessible in the courthouse. It has the mailing address of the courthouse. The fact that it's a stand-alone building and that for preservation purposes was maintained . . . I find under the facts that I think are really undisputed in the case and I do find that they all are, is that I would conclude that the use of the John Hanson House is part of the courthouse in Frederick County.

The court rejected McCarthy's claim that the County was profiting from its lease arrangement with the OPD:

> I would find that the [C]ounty is not, in my opinion, de[r]iving what I would say is a profit as that is defined. The memorandum of understanding between the [S]tate and the [C]ounty provides that the [C]ounty is to receive, in essence, the percentage of costs associated with the maintenance of that property, and I think that comes in line with the other cases that were cited by [McCarthy] with respect to some of these ancillary uses . . . . I believe the use of the public defender in the courthouse buildings is ancillary to the governmental function. The Public Defender's office is necessary for the administration of justice in the buildings; that it makes sense to have the Public Defender's Office either in or near by the courthouse where much of their work is done . . . . I find that the County is not making a profit as that is defined under the terms of governmental immunity. So based on that, I do find that governmental immunity applies with respect to the negligence claim in the case.

Second, the court granted summary judgment on McCarthy's private nuisance claim. The court explained that, to prove a private nuisance, the plaintiff must possess a

property interest in the property in question. The court found that it was undisputed that McCarthy, as an employee of the OPD, did not have any such interest in the John Hanson House.

The court entered an order to this effect, and McCarthy timely appealed. We shall include additional facts as necessary in the discussion.

## STANDARD OF REVIEW

When a party moves for summary judgment, the court "shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2-501(f).

The issue of whether a trial court properly granted summary judgment is a question of law. *Butler v. S & S P'ship*, 435 Md. 635, 665 (2013). In an appeal from the grant of summary judgment, this Court conducts a de novo review to determine whether the circuit court's conclusions were legally correct. *See D'Aoust v. Diamond*, 424 Md. 549, 574 (2012). We consider the record in the light most favorable to the nonmoving party and construe any reasonable inferences that may be drawn from the facts against the moving party. *Blackburn Ltd. P'ship v. Paul*, 438 Md. 100, 107–08 (2014). "A plaintiff's claim must be supported by more than a 'scintilla of evidence,' as there must be evidence upon which [a] jury could reasonably find for the plaintiff." *Id.* at 108 (cleaned up and citations omitted).

## DISCUSSION

## I.

## NEGLIGENCE

"[T]he doctrine of governmental immunity is alive and well in Maryland today." *Heffner v. Montgomery Cnty.*, 76 Md. App. 328, 333 (1988). However, the doctrine "does not treat all governmental units equally." *Id.* "Unlike the total immunity from tort liability which the State and its agencies possess, the immunity of counties, municipalities and local agencies is limited to tortious conduct which occurred in the exercise of a 'governmental' rather than a 'proprietary' function." *Austin v. Mayor of Balt.*, 286 Md. 51, 53 (1979). The Supreme Court of Maryland has "recognized the difficulty in distinguishing between those functions which are governmental and those which are not[.]" *Rios v. Montgomery Cnty.*, 386 Md. 104, 128 (2005) (citation omitted). Nevertheless, in *Mayor of Balt. v. State ex rel. Blueford*, 173 Md. 267 (1937), the Court announced a multi-factored test to determine whether a function is "governmental" or "proprietary":

> Where the act in question is sanctioned by legislative authority, is solely for the public benefit, with no profit or emolument inuring to the municipality, and tends to benefit the public health and promote the welfare of the whole public, and has in it no element of private interest, it is governmental in its nature.

*Id.* at 276. "Another way of expressing the test . . . is whether the act performed is for the common good of all or for the special benefit or profit of the corporate entity." *Tadjer v. Montgomery Cnty.*, 300 Md. 539, 547 (1984).[4]

Our appellate courts have evaluated the "profit or emolument" factor to determine whether a local government's earning of a significant profit could support a finding that a function or activity is proprietary. *See Tadjer*, 300 Md. at 549–50 (explaining that a county's operation of a landfill could, if it resulted in significant profit, at least theoretically be a proprietary function); *Reed v. Mayor of Balt.*, 171 Md. 115, 118–19, 122 (1936) (in a slip and fall case, holding that the city engaged in a proprietary function where it owned the market and "deriv[ed] revenue" by renting the market's stalls, emphasizing that it had a duty to keep the market "reasonably safe for public travel"); *Bagheri v. Montgomery Cnty.*, 180 Md. App. 93, 96 (2008) (holding that the county was engaged in a governmental function where it did not derive profit from operating a parking garage); *Town of Brunswick v. Hyatt*, 91 Md. App. 555, 564–65 (1992) (holding that the town was engaged in a governmental function where it did not derive more than a modest profit from operating and charging for entry to public pool); *Burns v. Mayor of Rockville*, 71 Md. App. 293, 308 (1987) (holding that the city engaged in a governmental function where it derived "little or no dollar profit or emolument" from charging tickets for a ballet program); *Austin*, 286 Md.

---

[4] One line of cases—addressing the so-called "public ways exception"—holds that the maintenance of public ways, such as sidewalks and roadways, is proprietary and that members of the public injured while traveling on such public ways may bring actions in negligence. *See, e.g.*, *Creighton v. Montgomery Cnty.*, 254 Md. App. 248, 254–55 (2022) (compiling cases). This exception is not applicable in this case.

at 66 (holding that the city's provision of day camp activities was a governmental function where the fees generated for day camp were sufficient to cover day-to-day expenses but did not result in a profit or emolument inuring to the city); *Blueford*, 173 Md. at 276 (holding that the city's maintenance of public pool as governmental function was not affected by fact that nominal fees were charged to use pool, where fees were insufficient to cover the expenses of its maintenance).

The question here is whether the alleged mold exposure occurred during the County's performance of a governmental function; that is, we must determine whether the County's maintenance of the John Hanson House is a governmental function. If that were the case, then the County would be immune from the negligence claim. *See Blueford*, 173 Md. at 272 ("[T]he primary and essential inquiry is whether the tortious act was done in the course of the performance of some governmental duty or function.").

## A.

### Summary Judgment Evidence

Before addressing this question, we summarize the summary judgment evidence about the John Hanson House and its relationship with the Courthouse Complex. The evidence consisted of various documents and the deposition testimony of the Chief of the County's Office of Capital Asset, Lease and Acquisition Management; the Lead Building Technician for the Courthouse Complex; and the Accounting Supervisor for the County's Division of Finance.

**1. County's Acquisition of John Hanson House for the Courthouse Complex**

In 1975, the County acquired a 4.3-acre parcel of land, consolidated from the City of Frederick and other entities, for the purpose of constructing a new courthouse at 100 West Patrick Street. As part of this land acquisition, the County obtained the property that had been home to John Hanson. The proposed architectural concept was to integrate the John Hanson House into the Courthouse Complex. It was determined that renovating the existing structure would be less expensive than building a new facility. The John Hanson House was envisioned to be used as commercial or office space in support of the new Complex, with potential occupants including the Office of the Public Defender.

**2. MOU Regarding the Construction and Maintenance of the Courthouse Complex**

On July 21, 1975, the State and the County entered a Memorandum of Understanding ("MOU") to cooperatively construct the Courthouse Complex, wherein "both the State and County will occupy space to provide a more efficient and effective delivery of services to the residents of Frederick County." The MOU provided that the State agencies to occupy the State's proposed space "shall include the District Court of Maryland, Office of the Public Defender, [t]he Department of Public Safety and Correction Services (Division of Parole and Probation) and the Department of Health and Mental Hygiene (Division of Juvenile Services), and any other agency as deemed appropriate."

The MOU required that construction costs would be shared between the State and County agencies, based on the respective percentage of the Complex each entity was

9

expected to occupy. According to the MOU, the County agreed to cover 70% of the construction costs, while the State would be responsible for the remaining 30%.

The MOU also provided that the County would be responsible for all operating, maintenance, and repair services in the Complex. This includes building management services such as custodial care, heating, lighting, air conditioning, and electrical maintenance. As with construction costs, the State and the County agreed to cover their proportional share of these expenses based on the ratio of the space they occupied in the Complex.

### 3. Completion of the Courthouse Complex

The Courthouse Complex was built in the early 1980s. As mentioned, it comprises the courthouse proper and the John Hanson House, with one address (100 West Patrick Street).

The Complex has been continuously used by the judiciary, various State and County agencies, and the police department. The courthouse proper has housed various State and County agencies, including the Child Support Division of the State's Attorney's Office, an office of the Maryland Department of Veterans Affairs, and an office of the State Comptroller. The John Hanson House, a four-story building that includes a basement, has been occupied by the OPD and the Juvenile Division of the State's Attorney's Office.[5]

The courthouse proper and the John Hanson House are connected by a shared stairwell and a ten-foot breezeway. Members of the public can access the John Hanson

---

[5] The OPD has also occupied space in the courthouse proper.

House through this breezeway, where security is managed by the same service responsible for the Complex. In addition, the County is responsible for the maintenance of the Complex, including the John Hanson House, with oversight from the building manager of the Complex.

### 4. County's Lease Agreements with the OPD

The OPD has been leasing office space in the John Hanson House since 1984. The lease agreement between the State and the County does not differentiate between the John Hanson House and the courthouse proper; it refers to the property as the "Frederick County Courthouse, 100 West Patrick Street." The lease outlines which State agencies occupy space in the Courthouse Complex and specifies each agency's proportionate share of expenses consistent with the MOU. In this context, "rent" refers to the percentage of building operating and maintenance costs.

The lease has been updated periodically to reflect changes in the State's proportionate share of rent based on the proportion of the Complex it occupies. The County first calculates what proportion of the net rentable square footage of the Complex is occupied by each agency, which can vary year to year. Then, at the end of each fiscal year, the County determines its actual operating expenses for the Complex as a whole, including costs for building maintenance, facility services, and courthouse security. Finally, each agency's proportionate share of operating and maintenance expenses is computed by multiplying its proportionate occupancy, expressed as a percentage, by the total annual operating and maintenance expenses. During the relevant period, the OPD occupied 17.67% of the net rentable square footage of the Complex (4,234 square feet of the OPD

11

space / 23,955 total square feet of rentable space in the Complex = 0.176748), and thus the County charged OPD for 17.67% of the operating and maintenance expenses.

The County's Division of Finance generates invoices and sends them to the State agencies. Payments are made monthly by each agency to the County at a specified rate. These payments are credited toward the total annual charge described above. For the years leading up to the alleged injury, the County charged the OPD as follows: $98,561.14 total for fiscal year 2016, $101,708.86 for fiscal year 2017, $109,327.69 for fiscal year 2018, and $124,931.60 for fiscal year 2019.

**B.**

**Analysis**

**1.  The John Hanson House Is a Part of a Courthouse.**

McCarthy argues that the John Hanson House is neither a courthouse nor part of the Courthouse Complex because no court proceedings or administrative functions take place there. Instead, the John Hanson House is physically separate from the courthouse proper and serves a distinct purpose. She highlights that during the early planning stages, the John Hanson House was earmarked for "commercial" use and has continued to operate as an office building for government agencies. We are not persuaded by the distinction McCarthy makes to isolate the John Hanson House from a courthouse, and we reject her contention that the John Hanson House is not part of the Courthouse Complex.

*Harford County Commissioners v. Love*, 173 Md. 429 (1938), is instructive. In *Love*, the plaintiff fell while on her way to the restroom in the basement of the Harford County courthouse. *Love*, 173 Md. at 430. The Supreme Court of Maryland concluded that the

maintenance of a courthouse is a governmental function that entitles the county to immunity. *Id.* at 434. It explained:

> The maintenance of a courthouse is a distinctive function of government. It is requisite for the convenient administration of public justice. The buildings devoted to that primary purpose in the counties are also customarily used by the county commissioners in the performance of their functions as the governing body of the county, and by other officials who are engaged in rendering essential public services. The judicial and administrative purposes to which such buildings are devoted necessarily impress them with a governmental character.
>
> . . . 'A municipal corporation is not liable for negligence in the construction and maintenance of buildings or apparatus used solely for governmental purposes; and this rule applies to a courthouse and its appurtenances . . . .'

*Id.* at 433 (citation omitted). The Court concluded that the "plaintiff's injury [was] received in her use of accommodations, gratuitously provided for the public convenience, in the building maintained by Harford [C]ounty for governmental purposes as a courthouse[.]" *Id.* at 434.

There is no genuine dispute of material fact that the John Hanson House is part of the Courthouse Complex, and, therefore, it is part of a courthouse. The summary judgment evidence clearly established that the John Hanson House was reconstructed to be incorporated into the Complex, sharing the same footprint and address. The decision to maintain it as a separate building was made solely to preserve its historic value and to avoid the costs associated with demolishing and fully reconstructing it.

Furthermore, the rationale in *Love* supports the idea that the immunity a local government enjoys as part of its maintenance of a courthouse is not limited to the areas where courtrooms are located or where administrative tasks related to the court are

13

performed. Rather, that immunity extends to other parts of the building, or in this case, the buildings within the Complex, that are occupied by agencies essential for the effective administration of justice and are used by various officials providing important public services. Indeed, the MOU explicitly states that the purpose of occupying the Complex with State agencies, such as the OPD, is to "provide a more efficient and effective delivery of services to the residents of Frederick County." The OPD provides legislatively mandated legal services,[6] and its location in a building of the Complex enhances the effective and efficient delivery of these services.

McCarthy focuses on specific language from *Love*, interpreting it narrowly to mean that if a building is not used "solely" and "gratuitously" for public purposes, it cannot be classified as a courthouse, entitling the County to immunity. She points out that public access to the interior of the OPD office in the John Hanson House was limited and that the County received funds for leasing space to State agencies like the OPD.

---

[6] The OPD is an executive branch agency of the State. *State v. Walker*, 417 Md. 589, 607 n.14 (2011); *see* Md. Code Ann., Crim. Proc. § 16-202. The purpose of the OPD is to:

(1) provide for the realization of the constitutional guarantees of counsel in the representation of indigent individuals, including related necessary services and facilities, in criminal and juvenile proceedings in the State; [and]

(2) assure the effective assistance and continuity of counsel to indigent accused individuals taken into custody and indigent individuals in criminal and juvenile proceedings before the courts of the State . . . .

Md. Code Ann., Crim. Proc. § 16-201.

The OPD must have at least one office in each district. *Id.* §§ 16-203(g)(2), 16-101(c). Among the various districts for the jurisdictions in the State, Frederick County is in District 11. *See* Md. Code Ann., Cts. & Jud. Proc. § 1-602(11).

14

McCarthy's interpretation falls short. If we were to follow her reasoning, it would suggest that the County would not have immunity for tort claims that arise in a judge's chambers, since chambers are not accessible to the public. Likewise, her reasoning would imply that the County would not be immune for tort claims arising in the clerk's office, as that office charges filing fees and does not operate "gratuitously."

### 2. Whether the County Profited from Leasing the John Hanson House Was Not a Question of Fact for the Jury.

Relying on *Tadjer v. Montgomery Cnty.*, 300 Md. 539 (1984), McCarthy contends that the determination of whether the County received substantial benefits from the lease is a question of fact for the jury and thus summary judgment should have been denied. In *Tadjer*, the Supreme Court of Maryland ruled that whether expenses for a county landfill were more than the revenue derived was a factual question:

> If, as in *Austin* and [*Blueford*], the income was not adequate to maintain the landfill or if this income were barely adequate to cover expenses, we would agree that this landfill operation was a governmental function. On the other hand, if the income derived was in an amount substantially in excess of the County's expenses for rent, operation and the like, so that the landfill was a real moneymaking proposition, it would be a proprietary function. *Only a trial on its merits can make this determination*.

300 Md. at 549–50 (emphasis added).

*Tadjer* is distinguishable from the case sub judice. In *Tadjer*, the trial court granted a demurrer to a plaintiff's claim for negligence against Montgomery County based on immunity. 300 Md. at 545. The Court reversed the trial court and this appellate court because there was no evidence before either court about the amount of expenses and revenues derived from the landfill:

15

> All we have is the fact set forth in the declarations that the County derived "substantial income" from this operation. We, of course, have no way of knowing the amount of this income. It may be great or small.

*Id.* at 549.

Unlike the Court in *Tadjer*, we have before us the expense and payment figures for the lease of space to the OPD, and thus this case is governed by the holding in *Blueford*, where the Court had sufficient evidence before it to determine that the operation of a swimming pool was not a profit-making proposition. *See* 173 Md. at 276–77; *see also Burns*, 71 Md. App. at 300–01 (rejecting the plaintiff's reliance on *Tadjer* to support the notion that whether the operation of a recreational ballet program at the civic center resulted in profit was a factual question because expense and income figures were developed in the record).

Significantly, the issue being challenged is not a question of fact. McCarthy did not dispute the figures presented in the documents during the proceeding below. She did not contest the actual costs of operating and maintaining the Courthouse Complex, the proportionate share charged to the OPD, or the amounts received by the County. Instead, she presented the circuit court with the conclusion that the undisputed facts showed that the County profited from the lease. *See Burns*, 71 Md. App. at 301–02 (explaining that plaintiffs did not present a factual dispute as to whether the municipality made a profit from its activity). Accordingly, under the circumstances here, whether the County derived a "profit or emolument" under the government/proprietary analysis was not a factual dispute for the jury to decide.

16

### 3. The County Did Not Profit from Leasing Space in the John Hanson House.

McCarthy argues that the circuit court erred in concluding that the County did not derive any profit from leasing space in the John Hanson House. She argues that the County's leasing of office space to State agencies like the OPD provided "substantial benefits" to the County in various ways and should be considered a proprietary function.

McCarthy asserts that the County's profits and benefits were significantly higher than the minimal fees charged for the use of municipal properties in the cases cited above. For support, she cites *Blueford*, 173 Md. at 269, where the municipality charged $0.05 for use of a public pool; *Burns*, 71 Md. App. at 299 n.1, where the municipality charged $1.50 per ticket for a recreational ballet program at a civic center; and *Austin*, 286 Md. at 61, where the municipality charged $3.50 per week for participation in a day camp. In contrast, she contends that the County earned over $124,000 in fiscal year 2019 by leasing office space in the building to the OPD.

The problem with McCarthy's argument is that she focuses on the amounts charged in other cases, comparing them to those charged in this case and equating them to a "profit," instead of evaluating whether the income generated by the County's leasing of the John Hanson House substantially exceeded its operational expenses. *See Tadjer*, 300 Md. at 549 (explaining that we assess whether "the income derived was in an amount substantially in excess of the County's expenses for rent, operation and the like, so that the [activity] was a real moneymaking proposition"). It is undisputed that the amount received from the OPD covered its proportionate share of the costs associated with operating and maintaining the Courthouse Complex during the relevant period, which includes the John Hanson House.

17

Furthermore, it is undisputed that the County did not earn any profit from this arrangement. Thus, it is clear from the record that leasing space to the OPD was not a money-making venture for the County.

McCarthy takes another approach to the argument, stating that the OPD was charged for "significant expenses that were not related to the State's tenancy," which existed only in the courthouse proper and did not serve or benefit the OPD. Such expenses include payment for courtroom security, maintenance of the courthouse proper, and custodial services provided to the courthouse proper. McCarthy claims that the County meets the "profit or emolument" criterion because, by charging the OPD for some costs of running the Complex, the County reduces its accrued expenses.[7] McCarthy does not cite any legal authority to support this argument, and our research did not reveal any case law that suggests this type of attenuated benefit is the kind of "profit or emolument" that supports a finding that a given function is "proprietary."

If we were to follow that reasoning, it could be applied to any government activity that charges fees, such as the public pool, the ballet program, or the day camp mentioned in the cases earlier. This implies that these activities could be considered proprietary because the fees collected help cover some of the costs associated with their maintenance and operation—costs that would not have been alleviated without these payments. Essentially, according to McCarthy's reasoning, any reduction in the County's expenses

---

[7] That State agencies are charged for their respective occupancies of the Courthouse Complex regardless of which building or buildings they occupy undermines McCarthy's attempts to meaningfully distinguish the two buildings in her earlier argument.

18

would be viewed as a benefit to the County, which would render the activity a proprietary function. However, as stated, the relevant inquiry in the governmental/proprietary assessment is not whether the local government collects any income at all, but whether the activity was a money-making proposition. *See Tadjer*, 300 Md. at 549.

### 4. The Maintenance of the John Hanson House Was Not a Proprietary Function.

McCarthy contends that the maintenance responsibilities arising from the lease, for which the County receives payment, render that activity a proprietary function. She asserts that the performance of maintenance obligations arising from the lease, which was intended to serve the tenant (the OPD), does not qualify as a governmental function. This is because it does not exclusively serve a public purpose or promote the welfare of the public.

We are unpersuaded by McCarthy's attempt to separate the purpose of the Courthouse Complex, which includes the John Hanson House, from the maintenance of the John Hanson House itself. McCarthy overlooks the public benefits of having a Complex that houses State agencies like the OPD. The MOU explicitly acknowledged that State and County agencies would "occupy space to provide a more efficient and effective delivery of services to the residents of Frederick County." The purpose of the Complex is furthered by the maintenance of all its parts, all of which serve the public by supporting efficient and effective delivery of governmental services. *See Burns*, 71 Md. App. at 305 (rejecting the plaintiffs' attempt to separate the recreational program of ballet in the civic center building from the maintenance of the building in which the program was conducted).

19

McCarthy places significant weight on the profit/emolument factor. However, determining whether an activity is governmental or proprietary "based primarily on whether the activity makes a profit does not comport with the test announced in *Blueford*." *Hyatt*, 91 Md. App. at 564. "[T]he purpose of the activity (*i.e.*, whether the activity 'tends to benefit the public health and promote the welfare of the whole public') is to be accorded equal weight with the question of profit." *Id.*

The policy issues related to the doctrine of governmental immunity and the maintenance and operation of courthouse components like the John Hanson House cannot be ignored. *See Blueford*, 173 Md. at 274 (specifically addressing the nature of a public swimming pool and its role in the community). Taking "the protection of governmental immunity away from the municipality would have a chilling effect on the municipality's willingness to provide this most vital and substantial public service." *Hyatt*, 91 Md. App. at 565. As discussed earlier, the County's use and maintenance of the John Hanson House, which houses occupants like the OPD, are devoted to delivering essential services to the public.

For the reasons stated, the circuit court did not err in granting summary judgment on the negligence count in the County's favor on grounds of governmental immunity.

## II.

## PRIVATE NUISANCE

Unlike with negligence claims, "counties and municipalities have never been accorded immunity from nuisance suits." *Bd. of Educ. of Prince George's Cnty. v. Mayor of Riverdale*, 320 Md. 384, 388 (1990). "[T]he lack of county and municipal immunity in

nuisance actions is based on the theory that a municipal corporation has no more right to erect and maintain a nuisance on its own land than a private individual would have to maintain such a nuisance on his land." *Id.* (citations and internal quotations omitted).

McCarthy argues that the court erred in granting summary judgment on the private nuisance claim on the basis that she did not have a property interest in the leased premises in the John Hanson House where she worked. McCarthy contends that the private nuisance claim was viable, arguing that she was a "lawful occupant of the John Hanson House" because she worked in the building pursuant to her employment with the OPD.

Maryland courts have adopted Section 821D of the Restatement (Second) of Torts (1965), which defines private nuisance as "a nontrespassory invasion of another's interest in the private use or enjoyment of land." *Blue Ink, Ltd. v. Two Farms, Inc.*, 218 Md. App. 77, 92 (2014). Ownership of the property in question is unnecessary to bring a claim of private nuisance. *Hoffman v. United Iron & Metal Co.*, 108 Md. App. 117, 133 (1996). As relevant here, however, such a claimant must either have lawful possession of or have a right to occupy the land. *Id.* at 133–34 (concluding that minors living on a property were "lawful occupants"—and therefore had standing to bring nuisance claims—based on their parents' lawful occupancy); *see also Green v. T.A. Shoemaker & Co.*, 111 Md. 69, 75 (1909) (holding that a tenant who had "exclusive possession and control of the rooms she occupied" could theoretically recover on a claim of private nuisance because the blasting and explosions she complained of were unquestionably a nuisance when performed "in the vicinity of another's dwelling house"); *Lurssen v. Lloyd*, 76 Md. 360, 367 (1892) (holding

that the resident plaintiff, despite having sold the property under mortgage, could bring a claim of private nuisance as long as he remained in physical possession of the property).

Section 821E of the Restatement (2d) of Torts (1977), titled "Who Can Recover for Private Nuisance," enumerates three classes of individuals who "have property rights and privileges in respect to the use and enjoyment of the land affected, including (a) possessors of the land, (b) owners of easements and profits in the land, and (c) owners of nonpossessory estates in the land that are detrimentally affected by interferences with its use and enjoyment."

Section 328E defines a "possessor of land" as "(a) a person who is in occupation of the land with intent to control it or (b) a person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, or (c) a person who is entitled to immediate occupation of the land, if no other person is in possession under Clauses (a) and (b)."

McCarthy argues that she was a "lawful occupant" of the John Hanson House and suggests that we broaden private nuisance law to permit claims by employees who have a legal right to be present at their workplace. However, she has not cited any legal authority to support the proposition that an employee has a sufficient property interest in their workplace to pursue a private nuisance claim. Our research of Maryland law has not yielded any results to support her claim. Therefore, we look to treatises and decisions from other jurisdictions for guidance.

In *Prosser and Keeton on the Law of Torts*, Professor Prosser summarizes the property rights protected in an action for private nuisance, explaining that the "original

22

character of private nuisance as an invasion of interests in land has been preserved. Apparently any interest sufficient to be dignified as a property right will support the action." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 87, at 621 (5th ed. 1984). Thus, a private nuisance claim "will lie in favor of a tenant for a term . . . , or a mortgagor in possession after foreclosure, or even one in adverse possession without title. Likewise it may be maintained by the holder of an easement, such as a right of way or a right to passage, light and air" and family members of the possessor sharing the possession with him. *Id.* at 621–22 (footnotes omitted).

> *On the other hand, it is generally agreed that anyone who has no interest in the property affected*, *such as* a licensee, *an employee* or a lodger on the premises, cannot maintain an action based on a private nuisance.

*Id.* at 621 (emphasis added and footnotes omitted); *accord* 66 C.J.S., *Nuisances* § 106, Westlaw (database update May 2025) ("[A] person having nothing more than the mere naked possession of land, without any title or vested interest therein, cannot maintain a suit to restrain a nuisance which injures the land.").

In *Higgins v. Connecticut Light & Power Co.*, 30 A.2d 388 (Conn. 1943), the plaintiff's intestate, Higgins, along with another plaintiff, Jacobson, were employed by the Connecticut state highway department to trim trees along a public highway. During this work, one of them died and the other was injured. *Id.* at 390. The complaint included claims of negligence and nuisance. *Id.* The Connecticut Supreme Court held that no recovery could be obtained for a private nuisance because the employees had no legal interest in the land in question. *Id.* at 391.

23

In *Kilts v. Kent County Board of Supervisors*, 127 N.W. 821, 821 (Mich. 1910), the plaintiff's decedent fell to his death when a tower platform collapsed as the decedent worked on a water tank covering. The plaintiff alleged both negligence and public and private nuisance against the board of supervisors that authorized the tower's construction, the contractors who built it, and the subcontractor who supplied the faulty joists responsible for the accident. *Id.* at 821–22. The trial court disposed of the negligence claim on the ground of governmental immunity. *Id.* at 821.

As for the nuisance claims, the plaintiff argued that the county should nevertheless be held liable because the tower and tank constituted a nuisance. *Id.* at 822. The Supreme Court of Michigan rejected the nuisance claims because to accept that "would be an extension of the law of nuisance." *Id.* The court explained:

> *The enunciation of the doctrine contended for would be attended by far-reaching results, and practically make every man the insurer of his help, his guests, and even strangers rightfully upon the premises. Practically it would have a tendency to eliminate the whole doctrine of negligence* in large classes of cases, for juries would be asked to find that buildings, machines, walks, roads, and all other articles or structures were nuisances if in any way defective or out of repair, because dangerous to those approaching them. *The doctrine of contributory negligence would go with that of negligence [i]f counsel's contention is correct*.

> We are of the opinion that a nuisance involves, not only a defect, but threatening or impending danger to the public, or, if a private nuisance, to the property rights or health of persons sustaining peculiar relations to the same, and that *the doctrine should be confined to such cases*.

*Id.* (emphasis added).

In *Reber v. Illinois Central Railroad Co.*, 138 So. 574 (Miss. 1932), the plaintiff sued a railroad company, asserting that the company's operations caused a nuisance

24

because the train engines that passed by his residence created a great volume of smoke and noise. *Id.* at 575. However, the evidence demonstrated that the plaintiff's home belonged to his employer, and his employer permitted the plaintiff to live there rent-free as part of his compensation for employment. *Id.* at 575–76. While finding that the plaintiff did not provide sufficient evidence to establish a nuisance, the court also found that, as a mere employee, the plaintiff did not have a sufficient interest in the property to bring a nuisance claim. *Id.* at 577–78. The court opined that:

> The complainant here owns no interest in the real property affected. He is not even a lessee. Nor is he a tenant in the legal sense of the term. He is a mere employee occupant at will, a weekly wage earner, occupying the house as an incident to his employment, and as a part of the compensation in consideration of his services. A person must have some estate, be it ever so little, such as that of a tenant at will, or on sufferance, to be a tenant. Occupation as servant, or licensee, does not make one a tenant.

*Id.* at 577.

Finally, in *Page v. Niagara Chemical Division of Food Machinery & Chemical Corp.*, 68 So.2d 382 (Fla. 1953), the Supreme Court of Florida considered a private nuisance claim brought by railroad employees against the owner of an adjacent factory. *Id.* at 383. The plaintiff employees alleged, *inter alia*, that "each of said plaintiffs is a lawful occupant of said Atlantic Coast Line export yard during their working hours." *Id.* at 384. Citing *Reber*, *supra*, the Supreme Court of Florida rejected that theory of occupancy, explaining that presence on the property during work was "not sufficient to show that [the employees] have such an interest in or relation to their employer's property as would entitle them to maintain a suit to enjoin the defendant's operation as for a private nuisance." *Id.*

25

We find these authorities instructive in holding that an employee's right to be present in the workplace does not confer upon her an interest in the property affected that would entitle her to maintain a private nuisance suit. Adopting McCarthy's interpretation would broaden the law of private nuisance to allow claims from licensees, invitees, and others without an interest in the property affected. At the hearing, the circuit court illustrated this very concern:

> [I]f you go to the point of allowing employees to assert, in essence, property rights of their employers, there's nothing to prevent that to be extended to business invitees in a property; and then even people who have even less interest in there if they're an occupant that is allowed on a property. So if I'm a homeowner, and I have guests over to my house, and I allow them on the property, does that mean then they have the rights to then assert the nuisance claim for something that occurred in my property that was from a neighbor[?] Say somebody has bad asthma, and the next door neighbor has a big bonfire out there putting particulates in the air, and the particulates come over into my—into the property and caused an asthma attack, and we say it was the nuisance, but I think at that point nuisance becomes unattached to the property interest, and I believe that the appropriate analysis would be that there needs to be some property-related interest for a person to assert a nuisance claim.

The court's insightful assessment of the potential consequences of adopting McCarthy's stance is on point. We add that embracing McCarthy's proposed expansion of private nuisance law "would have a tendency to eliminate the whole doctrine of negligence in large classes of cases," including the defense of contributory negligence, as discussed in *Kilts*, 127 N.W. at 822. Furthermore, such an expansion would enable a plaintiff whose negligence claim against a local government is barred by governmental immunity to circumvent that defense by asserting an alternative claim for private nuisance.

26

For the reasons stated, the court did not err in granting summary judgment on the private nuisance claim.

**JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY AFFIRMED. APPELLANT TO PAY COSTS.**